[No. A058813. First Dist., Div. Four. Mar. 8, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
TOMMY WILLIAM FILSON, Defendant and Appellant.

COUNSEL

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald E. Niver and Margo J. Yu, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

POCHÉ, J.—A jury found defendant Tommy William Filson guilty of one count of committing a lewd or lascivious act upon a child under fourteen years of age (Pen. Code, § 288, subd. (a)), but could not reach agreement on two other identical charges. For this offense defendant was sentenced to state prison for the middle term of six years, with a consecutive term of five years for a prior serious felony conviction (Pen. Code, § 667, subd. (a)). Defendant appeals from the judgment of conviction.

The background necessary for disposition of this appeal lends itself to brevity. The three major charges against defendant[1] were that he had committed sexually provocative touching of the two minor daughters of friends

---

[1]In addition to the three counts for violating Penal Code section 288, subdivision (a), defendant was also charged with the misdemeanor offense of failing to register as a convicted sex offender (Pen. Code, § 290, subd. (a)). It was also alleged in the information that defendant had a 1980 Idaho conviction for assault with intent to commit rape and kidnapping,

at the conclusion of a party. The incident was reported to police after defendant had departed. Defendant was arrested at approximately 1:15 a.m.; taken to a police station where he was interviewed by a Detective Freitas; and then taken to the hospital, where a blood sample drawn at 1:52 a.m. showed defendant's alcohol level was .16 percent. The sole defense asserted was that defendant was too intoxicated to form the specific intent needed for conviction. (See *People* v. *Lang* (1974) 11 Cal.3d 134, 141, fn. 5 [113 Cal.Rptr. 9, 520 P.2d 393].)

The trial began with testimony from Marlene L., the mother of one of the alleged victims, and one of the adults present at the party. Among the various points she covered was the fact that defendant had been drinking during the course of the party; although specifics as to what beverage and how much could not be remembered, she did recall that defendant did not appear to be intoxicated. The next witnesses were the two alleged victims (aged seven and ten on the date in question). The final witness was Deputy Sheriff Eric Gelhaus, the officer who arrested defendant. He testified that during the course of effecting the stop and arrest he formed the opinion that defendant was under the influence of alcohol. Defendant had difficulty in keeping his balance and in following the commands of Gelhaus. On the other hand, defendant did follow those commands, did seem oriented to his surroundings, and did appear "to make sense" while talking with Gelhaus.

The first day of trial ended in the middle of Gelhaus's cross-examination. After the jury had been sent home, the prosecutor moved for a ruling directing defense counsel "not ask any witnesses that might be called . . . whether or not Mr. Filson made a statement to them." The prosecutor feared that should "I object because it is hearsay . . . then I am in the position of looking like I am holding out something from the jury." Defense counsel objected on the ground that the prosecutor's motion was untimely: "They opened the door to it, we have got full range." The trial court granted the motion and recessed for the day.

At the start of the trial's second day, out of the jury's presence, defense counsel addressed the court as follows: "Your Honor, the Court made a ruling last evening as we concluded outside the presence of the jury pursuant to a motion made by the People in limine that any statement made by Mr. Filson not be made reference to by the defense.

"It has come to my attention that there were two separate tape[] recorded statements in this case. I didn't realize it yesterday. On the evidence sheets

a serious felony within the meaning of Penal Code section 667, subdivision (a). Defendant entered a plea of no contest to the misdemeanor charge immediately before the start of his trial. The validity of the prior conviction enhancement allegation was submitted to the trial court, which found it to be true.

there is reference to a tape recorded statement, I have a transcript of a statement made by Mr. Filson, and I felt our discovery was complete[.] Now I realize [that] within minutes of his arrest while at the hospital extracting blood from his arm the night that he was arrested, shortly before that, perhaps that in the patrol car on the way up[,] there was a tape reported [*sic*] statement. I believe that his state of mind, his demeanor, his level of or lack thereof of intoxication is at issue in this case and his demeanor is very relevant. We have the officer's testimony, however, [I] never heard the tape nor do I have a transcript of it[.] I recall Ms. Knotts [the prosecutor] does have [the] copy she has, as well her investigation was not in and of course that was late yesterday . . . . I found out today from Deputy Gelhaus that he turned it over to Deputy Freitas. I can only assume that it is evidence, we have never heard it and I believe that the demeanor contained within that tape can be very, very relevant in this case. And [ ] first of all I need to hear it, and secondly, we would ask the court to give us a limiting instruction, if need be, that perhaps the jury is not to take the contents of that conversation for the truth of the matter which is asserted or contained therein but for the very demeanor in his speech."

Upon being asked by the trial court to comment, the prosecutor stated: "Yes, Your Honor. One, there is no request by defense for these tapes that's why defense doesn't have any, never received any informal discovery request, two, as far as limiting [an] instruction regarding the tapes, the defense can question the officer as to his intoxication level and through his testimony determine what his intoxication level was at the time of the arrest. The only thing that the tapes—the tapes would be cumulative of that evidence plus it only goes to show how Mr. Filson was at one in the morning when he was arrested and was at the hospital, where these events occurred at 11:30 midnight, around that time period. It would not go to show that he was intoxicated at the time that the events occurred[,] which is incumbent in order to even get an instruction[ ] regarding voluntary intoxication, that intoxication should be shown at the time of the offense. [¶] Under 352 of the Evidence Code such a hearing, the tape even with the limiting instruction, the bell is rung, the prejudicial effect outweighs the probative value of that tape." The court then announced that "The ruling will stand."

Deputy Gelhaus then resumed his testimony, which was concluded after about 30 minutes. The defense presented no evidence before resting. The case was sent to the jury at 3 p.m. in the afternoon. The jury deliberated for the rest of the second day, all of the third, and half of the fourth day. During their deliberations they asked to have certain testimony from both victims, as well as defense counsel's closing argument, read back to them. They also asked for additional instruction as to how the intent required for conviction

was defined and when it could be shown. At approximately 1:45 p.m. in the afternoon of the third day of its deliberations the jury returned its verdict finding defendant guilty as charged with respect to the count relating to one of the victims; a mistrial was declared as to the two counts concerning the other victim after the trial court accepted the jury's report of deadlock.

It is clear that two tapes were made on the night of defendant's arrest. One, recording defendant's interview with Detective Freitas, was provided to the defense. It is the second, apparently made earlier by Deputy Gelhaus, which is at the heart of defendant's contention that the trial court's refusal to order it produced by the prosecution amounted to a violation of defendant's due process rights. This contention has merit.

■ "Under the due process clause of the Fourteenth Amendment to the United States Constitution, the prosecution has a duty to disclose all substantial material evidence favorable to an accused, including evidence bearing on the credibility of a prosecution witness; the duty exists whether or not the evidence has been requested, and it is violated whether or not the failure to disclose is intentional." (*People* v. *Hayes* (1990) 52 Cal.3d 577, 611 [276 Cal.Rptr. 874, 802 P.2d 376].) Our Supreme Court has held that ". . . the prosecution's duty of disclosure extends to *all* evidence that reasonably appears favorable to the accused." (*People* v. *Morris* (1988) 46 Cal.3d 1, 30, fn. 14 [249 Cal.Rptr. 119, 756 P.2d 843], original italics.)

■ These principles leave no room for doubting that the tape sought by the defense should have been ordered disclosed. Defendant's counsel clearly demonstrated how it could be favorable to the defense in showing that it could impeach the testimony of Deputy Gelhaus regarding the extent of defendant's intoxication. Defense counsel could also have pointed out that the evidence would also impeach Marlene L.'s testimony that defendant was not intoxicated. Moreover, a tape preserving the sounds of a grossly intoxicated defendant talking would constitute persuasive circumstantial evidence supporting the defense theory that defendant was too drunk to form the specific intent needed for conviction.

Contrary to what the prosecutor intimated to the trial court, the absence of a defense request for the tape was irrelevant to the prosecution's independent duty of disclosure. No proof of scienter is required; inadvertence and good faith cannot excuse failure to comply with the duty of disclosure. (See *People* v. *Morris, supra,* 46 Cal.3d 1 at p. 30.) Nor could the prosecution escape that duty by claiming the tape was cumulative to Gelhaus's testimony. The tape would be cumulative only in the sense that it presumably would corroborate Gelhaus's testimony that defendant was intoxicated. But,

more importantly, at least until someone heard it, it should not be assumed that the tape would substantiate Gelhaus's opinion as to the presence or absence of any impairment to defendant's cognitive and motor functions. In short, the possibility of significant potential for helping the defense and hurting the prosecution cannot be excluded. The tape having met the test for material evidence, it was clear error for the prosecution to withhold it from the defense, and equally clear error for the trial court not to order it produced for the defense. (See *People* v. *Garcia* (1993) 17 Cal.App.4th 1169, 1179-1182 [22 Cal.Rptr.2d 545] and authorities cited.)

Determination of whether this error was prejudicial will be held in abeyance pending our consideration of defendant's other contention, that the trial court should not have excluded the tape as evidence. The peculiar posture with which this claim comes here requires some preliminary comment.

■ Defendant argues that exclusion cannot be sustained by Evidence Code section 352 (hereafter section 352), a proposition the Attorney General vigorously disputes. Both parties' reference to section 352 is at first glance somewhat puzzling, for this statute was not mentioned until the trial's second day when the matter of the phantom tape first arose. The parties correctly treat the proceedings at the end of the first day and the start of the second day as having a single object—getting the trial court's ruling on proposed methods for impeaching Deputy Gelhaus's testimony concerning the level of defendant's intoxication.[2] So viewed, section 352 is fairly seen as invoked by the prosecution during the course of those proceedings.

Section 352 gives a trial court discretion to exclude probative evidence,[3] but the nature of discretion requires that the court's decision must be an informed one. " 'To exercise the power of judicial discretion all the material facts . . . must be both known and considered.' " (*In re Cortez* (1971) 6 Cal.3d 78, 85-86 [98 Cal.Rptr. 307, 490 P.2d 819], citing and quoting *People* v. *Surplice* (1962) 203 Cal.App.2d 784, 791 (21 Cal.Rptr. 826).) This court recently noted that "Judicial discretion must be informed, so that its exercise does not amount to a shot in the dark." (*Estate of Herrera* (1992) 10 Cal.App.4th 630, 637 [12 Cal.Rptr.2d 751].) Here, although the existence of the tape was not in dispute, neither side appears to have had a precise idea of what was on it. Indeed, the very point of the defense trying to get the tape

---

[2]Defendant views much of the second day's argument as being in effect a motion for reconsideration of the ruling made at the conclusion of the first day. We see no reason to challenge this characterization, or the Attorney General's tacit acceptance of it.

[3]Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

was to acquire that knowledge. By ruling without knowing what was on the tape, the trial court could not make an intelligent evaluation of any probative value of the tape, could not assess any prejudice it might pose, and therefore could not undertake the weighing of these factors required for an informed exercise of the discretion granted by section 352. (See *People* v. *Holt* (1984) 37 Cal.3d 436, 453 [208 Cal.Rptr. 547, 690 P.2d 1207].) In short, the trial court could not be in the position to exercise *any* discretion until it knew what was on the tape.

■ Two grounds were asserted by the prosecutor as justifying exclusion of evidence concerning the undiscovered tape and statements made by defendant to "any witness"—that it would be (1) cumulative and (2) prejudicial to the prosecution. Neither is sound.

Cumulative evidence has traditionally been refused admission if it threatens "confusing the jury and obscuring the fundamental issues." (*People* v. *Carter* (1957) 48 Cal.2d 737, 749 [312 P.2d 665].) Section 352 allows exclusion of cumulative evidence if it would necessitate undue consumption of time. (*People* v. *Burgener* (1986) 41 Cal.3d 505, 525 [224 Cal.Rptr. 112, 714 P.2d 1251].) The plain meaning of cumulative as "repetitive" or "additional" (e.g., *People* v. *Evers* (1992) 10 Cal.App.4th 588, 599, fn. 4 [12 Cal.Rptr.2d 637]; *Woodman* v. *Superior Court* (1987) 196 Cal.App.3d 407, 414 [241 Cal.Rptr. 818]) obviously implies in this context that other evidence on the point at issue has already been introduced. But, at the time the trial court made its ruling, no inconsistencies in Deputy Gelhaus's testimony had been established; his version that defendant displayed no visible mental impairment stood unimpeached. Thus, evidence from the tape could not be cumulative because there was as yet no other evidence to be cumulative to.

The trial court's ruling assumed that, if there were inconsistencies in Deputy Gelhaus's testimony, defense counsel would elicit them without need of the tape. This is flattering but hardly realistic. Because counsel did not know what was on the tape, he could not know when Gelhaus would be vulnerable to impeachment with information from the tape. Lacking this extrinsic aid, counsel would in effect be flying blind, forced to trust to hunch and luck while being deprived of a vital tool ordinarily backing up cross-examination. The tape might be cumulative to cross-examination as a *method* of developing impeaching inconsistencies in Gelhaus's testimony. But as evidence of such inconsistencies the tape would not be cumulative. To be cumulative imports that something of like effect is already shown. (See *Woodman* v. *Superior Court, supra,* 196 Cal.App.3d 407 at p. 414.) No inconsistencies in Gelhaus's testimony had, however, been established at the time the trial court made its exclusionary ruling. The trial court could

therefore have no basis for assuming that any inconsistencies shown by the unheard tape would be the same, and thus truly cumulative, to whatever inconsistencies defense counsel might develop in cross-examining Deputy Gelhaus.

At best the ruling confused means and ends, erroneously assuming that the substance of impeachment would be accomplished, so that more of the same would be cumulative. But, as previously noted, the actual sound of defendant speaking contained on the tape would be much stronger evidence than Deputy Gelhaus's opinion testimony regarding defendant's condition at the time of his arrest. "Evidence that is identical in subject matter to other evidence should not be excluded as 'cumulative' when it has greater evidentiary weight or probative value." (*People* v. *Mattson* (1990) 50 Cal.3d 826, 871 [268 Cal.Rptr. 802, 789 P.2d 983].)

■ The prosecutor's assertion that "the prejudicial effect outweighs the probative value of that tape" cannot be sustained. The precise nature of the prejudice feared by the prosecutor was not identified. When section 352 speaks of excluding evidence having "substantial danger of undue prejudice" it looks to situations where evidence may be misused by the jury. Nothing suggests that the tape would "arouse the emotions of the jurors" or "be used in some manner unrelated to the issue on which it was admissible." (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1016 [254 Cal.Rptr. 586, 766 P.2d 1].) The intended use was clearly stated and was clearly proper as relating to what the defense had already told the jury was the main issue—defendant's mental state. (See *People* v. *McAlpin* (1991) 53 Cal.3d 1289, 1310, fn. 15 [283 Cal.Rptr. 382, 812 P.2d 563].) Any collateral misuse could be minimized by editing, a limiting instruction, or argument by the prosecution concerning its evidentiary weight.

■ The same is true with respect to the prosecutor's earlier success in foreclosing defense inquiry of "any witnesses that might be called" concerning statements made by defendant. Just like the tape, evidence of statements made by defendant on the night of the incident and his arrest would be relevant to "his state of mind, his demeanor, his level of or lack . . . of intoxication." Such evidence could bolster the sole defense theory and also impeach the testimony of Marlene L. and Deputy Gelhaus as to defendant's unimpaired state. Insofar as the prosecution may have been suggesting that it would be prejudiced by the mere voicing of objections, one premise of that position—that the prosecutor would be objecting to inadmissible hearsay evidence—was erroneous: As previously mentioned, defendant had identified a valid nonhearsay purpose for the evidence. An additional premise is that excluding evidentiary objections is within the purview of section 352.

This is also incorrect. By its plain language section 352 is limited to excluding "evidence." Objections to questions are not evidence. The jury would be told this by an instruction (see CALJIC No. 1.02), and nothing suggests that the instruction would be ineffective.

■ The trial court's rulings prevented the defense from obtaining and using the tape, and also foreclosed all inquiry into the legitimate field of favorable inferences deducible from defendant's statements. The net effect was to hobble defendant's ability to challenge a crucial prosecution witness and to present independent, objective, and admissible evidence for the sole defense theory. The failure to produce the tape by itself amounted to a violation of due process. (See, e.g., *Alford* v. *United States* (1931) 282 U.S. 687, 692 [75 L.Ed. 624, 627-628, 51 S.Ct. 218]; *People* v. *Ruthford* (1975) 14 Cal.3d 399, 406 [121 Cal.Rptr. 261, 534 P.2d 1341, A.L.R.4th 3132].) As material evidence, the suppressed tape undermines confidence in the verdict. (See *United States* v. *Bagley* (1985) 473 U.S. 667, 678 [87 L.Ed.2d 481, 491-492, 105 S.Ct. 3375]; *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1272 [278 Cal.Rptr. 640, 805 P.2d 899].) The trial court's abusing its section 352 discretion by foreclosing possible use of the tape for impeachment only aggravated the situation. (See *People* v. *Cooper* (1991) 53 Cal.3d 771, 816 [281 Cal.Rptr. 90, 809 P.2d 865].)

These errors cannot be excused as harmless. The case against defendant would be constitutionally sufficient (see *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573-574, 99 S.Ct. 2781]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 576-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]), but it was far from overwhelming. The jury deliberated long and hard, troubled (as evidenced by its request for additional instructions) by the matter of defendant's intent, the very issue the defense would have developed but for the trial court's rulings. After deliberating longer than the evidentiary phase of the trial, the jury was able to reach a verdict on only one of the three charges against defendant. Clearly, the scope for doubt and misgivings is substantial. In these circumstances, neither *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243] nor *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065] can be satisfied.

Defendant raises additional claims of error, but only one warrants mention. Defendant argues—and the Attorney General does not dispute—that the version of CALJIC No. 10.41 (Lewd Act with Child under Fourteen Years—Defined) given to the jury suffered from the defect identified in *People* v. *Wallace* (1992) 11 Cal.App.4th 568 [14 Cal.Rptr.2d 67]. The revised version of the instruction should be used in the event of a retrial.

The judgment of conviction is reversed.

Anderson, P. J., and Perley, J., concurred.