[No. E012661. Fourth Dist., Div. Two. Jan. 9, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
TONY RUSSELL WALKER, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II through IV, inclusive, and VI through XI, inclusive.

## COUNSEL

Gregory L. Rickard, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Garrett Beaumont and David I. Friedenberg, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HOLLENHORST, J.**—Defendant, Tony Russell Walker, appeals from his conviction of first degree residential robbery and burglary, raising several

issues ranging from sufficiency of the evidence to instructional errors. For the reasons stated herein, we affirm.

## I

### Facts

*Prosecution Evidence:*

On September 7, 1992, at approximately 4:45 a.m., Officer Glenn Carr of the San Bernardino Police Department spotted a car parked near the northwest corner of 13th and Arrowhead in San Bernardino. The car was parked adjacent to the apartment complex located at 1334 North Arrowhead. Officer Carr observed two Black women in the backseat of the car, no one in the front seat and the motor was running. Upon investigation, the women told the officer that they were waiting for their boyfriends to return from their visit with someone in apartment 1 of the apartment complex. Officer Carr then received a radio call about an unrelated incident and left the area.

About 5 a.m. that same morning, Gary Slaughter was disturbed from his sleep at his apartment (apartment 24) in the same apartment complex. He heard a knock on the door. When he opened it, two Black men rushed in and attacked him. He was hit in the eye with a gun and struck on the mouth causing his partial dental plate to fall apart.

Mr. Slaughter fell backwards and was ordered to stay on the floor or have his head blown off. The assailants tied his hands behind his back with a pair of socks and tied his feet with some antenna wire from the television. He was blindfolded with another sock. As he lay on the floor on his stomach with his face buried in a pillow, the assailants ransacked his apartment demanding the location of his safe.

Mr. Slaughter owned a portable strongbox containing $640 in cash and important papers. He told them that it was located under his bed and directed them to the keys. During this time, one of the men kept hitting him on the back of his head with a hard object. Mr. Slaughter estimated that the men left within five minutes after their arrival. He then freed himself and asked a neighbor to call the police.[1]

Officer Carr arrived at the apartment at approximately 5:07 a.m. and called for an identification technician, Gloria Hurt, to investigate the scene.

---

[1] While en route to the robbery call, Officer Carr asked another officer dispatched to the scene to check the suspicious vehicle. However, it was gone. After investigating the incident at Mr. Slaughter's apartment, Officer Carr knocked on the door to apartment 1 but received no answer. Officers went to the residence of the registered owner of the subject car; however, they were unable to locate it.

Mr. Slaughter was unable to identify the men who had attacked him. When Ms. Hurt arrived, she photographed the victim and the apartment. She also obtained two fingerprints from the strongbox.

On October 14, 1992, a tracing of the latent print lifted from the bottom of the strongbox was sent to the Cal. I.D. fingerprint identification system. The Cal. I.D. computer identified the print as belonging to defendant and Cal. I.D. sent a copy of defendant's fingerprints to the San Bernardino Police Department. Ms. Hurt compared the latent print with defendant's known fingerprints and concluded that the latent print was from defendant's middle finger.

On January 12, 1993, Ms. Hurt rolled a set of defendant's fingerprints and compared them to the latent print recovered from the strongbox and the ones received from Cal. I.D. She again concluded that the print from the strongbox was from defendant's middle finger. The other prints recovered from the strongbox were not inconsistent with defendant's fingerprints; however, they did not contain enough points of positive comparison to be used. Ms. Hurt could not tell how long the latent print had been on the strongbox.

Mr. Slaughter testified that he had moved into the apartment complex in May of that year and knew a majority of the tenants in the complex because he had met them through Alcoholic Anonymous meetings. His friends would visit him from time to time; however, he had not been visited by any friends that did not live in the apartment complex. He did not know defendant and had never had defendant over to his apartment, which was approximately 12 feet by 15 feet and contained a bathroom and kitchenette. His bed was located in the main room on the wall opposite the front door. It was separated from the rest of the room by a rattan, folding partition which was roughly six feet high. Mr. Slaughter always kept his apartment locked.

Mr. Slaughter testified that he was going through eviction proceedings at the time of the robbery and that the money was going to be used to pay the back rent if the landlord would let him stay in the apartment. However, he inconsistently testified that he was not being evicted for nonpayment of rent. He also testified that the apartment manager, Louanne Whiting, was tired of him living in the complex and wanted him to leave.

The apartment manager testified that she did not recognize defendant nor could she recall seeing him at the complex.

*Defense Evidence:*

During the cross-examination of Ms. Hurt, she acknowledged that FBI guidelines require 12 points of similarity to positively match fingerprints

compared to 8 points required by the San Bernardino Police Department. She found eight points of similarity between the print taken from the strongbox and defendant's print but she did not look for more than eight. Nonetheless, defendant conceded that his prints were on the box.

Defendant took the stand in his defense. He testified that in August 1992, he and a woman named Charlene had visited someone in the apartment complex. He returned to the complex later in that same week and met a person whose street name was "Eight Ball." "Eight Ball" had invited him up to apartment 24. Someone else was present but defendant only vaguely saw the person. While inside, defendant set a beer down on a table. He recalled seeing a box (similar to Mr. Slaughter's strongbox) on the table which he might have moved out of the way to set his beer down. Defendant visited the apartment on other occasions prior to the robbery, but he never saw Mr. Slaughter during those visits.

Defendant testified that he had worked on a friend's car in San Bernardino on Sunday, September 6, 1992. After completing the work, he visited with a friend until midnight or 1 a.m. He then went to the residence of Jackie Jones, where he slept all night. He believed that he did not leave her home earlier than 10 or 11 a.m. on the morning of the robbery.

The apartment manager testified that she noticed Mr. Slaughter would leave his door open while watching television and while visiting a neighboring apartment; however, he always remained within view of his front door.

### II-IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### V

*Did the Length of the Jury's Deliberations Suggest That the Case Was Closely Balanced?*

■ Defendant contends that because of the length of the deliberations, the fact that the jury requested readbacks of testimony, and the fact that the jurors inquired as to how long they should deliberate before concluding that they were hung, we must inescapably conclude that the case was so closely balanced that it is reasonably probable that admission of the proposed

*See footnote, *ante*, page 432.

testimony of Ms. Whiting, the apartment manager, would have led to a more favorable result for defendant.[5]

In support of this contention, defendant refers to *People* v. *Woodard* (1979) 23 Cal.3d 329, 341 [152 Cal.Rptr. 536, 590 P.2d 391] and *People* v. *Williams* (1971) 22 Cal.App.3d 34, 40 [99 Cal.Rptr. 103]. We find neither of these cases controlling.

In *Woodard*, our Supreme Court was called upon to decide "if a witness, other than a defendant, may be impeached at trial by felony convictions whose probative value may be outweighed by the risk of undue prejudice." (*People* v. *Woodard, supra*, 23 Cal.3d 329, 332.) Finding that neither of the felony convictions had any direct bearing on the witness's truthfulness, they should have been excluded. Because the trial court had allowed such impeachment, the court was further required to determine whether the trial court's error was prejudicial. Writing for the majority, Chief Justice Bird stated, "[t]he issue of guilt in this case was far from open and shut, as evidenced by the sharply conflicting evidence and the nearly six hours of deliberations by the jury before they reached a verdict. Clearly, the jury had misgivings about [the victim's] identification of [defendant] as the culprit." (*Id.*, at p. 341.)

We find nothing in the opinion which relates the length of the jury's deliberations with the length of the trial such that we can make any comparison between the facts of this case and those in *Woodard*. Moreover, the *Woodard* court fails to indicate whether there were any jury questions or requests for readbacks of testimony. Accordingly, we decline to take Justice Bird's isolated comment that the jury deliberated for nearly six hours as legal authority for us to conclude that because defendant's jury deliberated for nearly six and one-half hours the case was closely balanced such that the exclusion of Ms. Whiting's testimony was prejudicial.

In *Williams*, the Second District Court of Appeal was called upon to review the trial of a defendant found guilty of murder in the first degree. The only issue at trial was "whether or not defendant was in the throes of a psychomotor epileptic attack as a result of which he lacked the consciousness to be aware of his actions or to deliberate upon the gravity of his act, premeditate, and harbor malice." (*People* v. *Williams, supra*, 22 Cal.App.3d

---

[5]Ms. Whiting's proposed testimony concerned individuals (who lived outside the complex) frequently visiting Mr. Slaughter's apartment. However, the trial court excluded her proposed testimony and we found that such exclusion was not error. Even if we were to assume that it was error, we found such error harmless because it was within the trial court's discretion to limit impeachment on collateral issues. (*People* v. *Redmond* (1981) 29 Cal.3d 904, 913 [176 Cal.Rptr. 780, 633 P.2d 976].)

34, 38.) In reversing the conviction due to errors and near improprieties in the case which, taken together, prejudiced the defendant, the court mentioned the jury's probable difficulty in reaching its decision. Specifically, the court observed the days and times of the jury's deliberations and the jury's notes to the bench, i.e., their need to have certain expert testimonies read. While this need was being considered by the trial court and counsel, the jury sent another note stating that they were unable to reach a verdict. In response, the court recognized that the jury had not had the benefit of rehearing the requested testimonies and thus asked them if it would help. After rehearing the testimonies, the jury reached a verdict.

Like *Woodard*, we find nothing in the *Williams* opinion which would help us in the instant case. In *Williams*, the jury, at one point, acknowledged that they were unable to reach a verdict. Referring to that acknowledgement, the Court of Appeal stated, "This probable difficulty in decision is mentioned because there are errors and near improprieties in the case which taken together spell prejudice. Any one of the defects, as a sole irregularity in the face of a strong prosecution case, would probably not be considered prejudicial, but the totality of all the matters to be discussed, in combination, in light of the demonstrably close case herein, does reach, we feel, the level of harmful prejudice." (*People* v. *Williams, supra*, 22 Cal.App.3d 34, 40.) Here, there is no evidence, absent defendant's speculation, that the jury, at any point during deliberations, was unable to reach a verdict.

Although the total time for deliberation was roughly six and one-half hours, while the total time for the presentation of evidence (excluding arguments and jury instructions[6]) was roughly two and one-half hours, we do not find that such lengthy deliberation is cause for concluding that it was error to limit Ms. Whiting's testimony. We know that part of that time was spent listening to a readback of the testimonies of three witnesses. It seems logical that such time should not be included in the time calculated for deliberation because during such time the jury was not actually deliberating the case, but was listening to the testimonies.

Additionally, we assume that the jury spent time going over their instructions to make sure that they were properly carrying out their duties. However, defendant does not consider that important. Instead it appears that defendant just chooses to take the lump sum calculation of time and conclude that it was too long, thus the case was closely balanced as to reasonable doubt. While we recognize that in some cases our Supreme Court has

[6]Without citing to any authority, defendant argues that the most accurate comparison between length of trial and jury deliberations is afforded by comparing the time of presentation of evidence to deliberation time, subtracting recess time from both sides of the equation.

inferred a close case from unduly lengthy deliberations we cannot do so under the facts of this case. (E.g., *In re Martin* (1987) 44 Cal.3d 1, 51 [241 Cal.Rptr. 263, 744 P.2d 374].) To do so in the absence of more concrete evidence would amount to sheer speculation on our part. Instead, we find that the length of the deliberations could as easily be reconciled with the jury's conscientious performance of its civic duty, rather than its difficulty in reaching a decision.

Furthermore, regarding the jury's request for information as to how long they should deliberate before they conclude that they are a hung jury, we find that defendant has mischaracterized the context in which this question was asked. The record indicates that this question was simply part of a series of questions that were no more than housekeeping questions sent to the court by the jury very early in deliberations. The jury further wanted to know how long they should deliberate on Thursday, their first day, whether they could deliberate on Friday and at what time should they start. Accordingly, we find that within the context of which it was asked, the question regarding a hung jury does not indicate that the case was closely balanced.[7]

## VI-XI*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[7]In his letter requesting oral argument, defendant referred this court to the recent case of *People* v. *Filson* (1994) 22 Cal.App.4th 1841 [28 Cal.Rptr.2d 335], informing us that he would be relying upon this case for the proposition that the fact the jury had deliberated longer than the evidentiary phase of the trial is a fact demonstrating prejudice and warranting reversal. We have reviewed this case and find it inapplicable.

In *Filson*, the defendant was charged with committing a lewd or lascivious act on a child under 14 years of age. His sole defense was that he was too intoxicated to form the specific intent needed for conviction. The trial court granted the prosecution's motion for a ruling directing defense counsel not to ask any witnesses that might be called whether or not defendant made a statement to them, and then let the ruling stand despite the subsequent discovery by defendant that the prosecution had a tape recording of defendant made immediately following his arrest which the prosecution had not shown to defendant.

The Court of Appeal reversed the defendant's conviction holding that it was error for the prosecution to withhold the tape recording and for the trial court not to order it produced for the defense. Defendant demonstrated how the tape recording could have been favorable to the defense by using it to impeach the testimony of the arresting officer as to the extent of defendant's intoxication, thereby supporting the theory that he had been too drunk to form the specific intent needed for conviction. Moreover, it was error to have excluded the evidence on the tape when the trial court did not know what was on it.

Regarding the jury's deliberations, the court stated: "The jury deliberated long and hard, troubled (as evidenced by its request for additional instructions) by the matter of defendant's intent, the very issue the defense would have developed but for the trial court's rulings." (*People* v. *Filson, supra,* 22 Cal.App.4th 1841, 1852.) Unlike *Filson*, in this case, there was no clear abuse of discretion by the trial court regarding the admission of evidence, and there is no indication the jury was troubled with the sufficiency of defendant's testimony.

*See footnote, *ante,* page 432.

# XII

## *Disposition*

The judgment is affirmed as modified.

Ramirez, P. J., and Mckinster, J., concurred.

A petition for a rehearing was denied February 7, 1995, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied May 10, 1995.