Filed 10/19/15  P. v. Arriaga CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040529 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1230121) |
| v. | |
| ALEJANDRO ARRIAGA, | |
| Defendant and Appellant. | |

Defendant Alejandro Arriaga appeals from a judgment of conviction entered after a jury found him guilty of shooting at an inhabited dwelling (Pen. Code, § 246[1] – count 1) and attempted murder (§§ 664, subd. (a)/187 – count 2).  The jury also found that defendant committed both offenses for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C) & (4)) and that he personally discharged a firearm during the commission of the attempted murder (§ 12022.53, subds. (b), (c)).  The trial court sentenced defendant to 35 years to life in state prison.  Defendant contends:  (1) there was insufficient evidence to support the finding that one of the gang's primary activities was committing crimes; and (2) the trial court erred in admitting evidence of uncharged offenses.  We affirm the judgment.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

## I. Statement of Facts

### A. Charged Offenses

On April 9, 2012, Jose Cano was having a party with about seven friends. His daughter Chanelle was also present. Defendant, who had not been invited, arrived at Cano's house at about 4:00 p.m. or 4:30 p.m. Defendant was drunk. Cano had previously spoken to defendant six to eight times and knew him as "Dro" and "Cabbage Patch." Cano asked defendant if he wanted a beer and defendant grabbed one. When one of Cano's friends said it was her beer, Cano told defendant to take the beer and leave. Defendant left.

About 15 minutes later, defendant returned to Cano's house. Defendant was loud and obnoxious. Cano took defendant into his bedroom and told him that he was disrespecting him and his friends. Defendant responded by stating that he was a "Northerner," and "I'm from the west side." He also claimed, "This is my varrio," and "This is my hood." Cano told defendant to leave. When Cano thought defendant was going to hit him, he pushed him towards the front door. Defendant stumbled and his red Chicago Bulls baseball cap fell off. As defendant left, he looked upset.

About 10 minutes after defendant left, Chanelle told Cano that someone was at the front door. Cano responded that he would answer the door. Both Cano and Chanelle heard defendant yell, "Hey, Joe." Immediately thereafter, three gunshots were fired. Everyone in the house hit the floor. One bullet struck the bedroom door frame to the left of where Cano was standing. Chanelle glanced out the window and saw defendant enter the front passenger seat of a black Dodge Magnum. Cano called 911.

Between 5:00 p.m. and 6:00 p.m. on April 9, 2012, Edward Armond was riding his bike to Cano's house to retrieve a tool that Cano had borrowed from him. When Armond was close to Cano's house, he heard a gunshot. As he pulled up to the entrance to Cano's driveway, he saw defendant's Dodge Magnum in the driveway and defendant pointing a

2

gun at the front door of Cano's house. As Armond watched, defendant fired two more shots. Armond turned around and left.

The police retrieved a red Chicago Bull's baseball cap and two bullets from Cano's house. One bullet was lodged in the front door and the other was lodged in the bedroom door frame. The police also found a bottle of Corona beer in Cano's driveway.

When the police went to defendant's apartment, they saw a black Dodge Magnum with two male occupants driving on the street about 40 feet away from them. After the driver looked at the police and sped off, they chased the Dodge Magnum with their lights and siren on. The driver of the vehicle ran some red lights, drove up to 100 miles per hour, lost control, and crashed into two parked cars in a driveway. The driver, who was wearing a red shirt underneath a gray sweatshirt, exited the vehicle and ran. The police chased him, but he escaped by jumping over a fence. Meanwhile, defendant walked to the front door of the house and sat on the porch. The residents called 911. Defendant was wearing a gray and red sweatshirt and white shoes with red trim when he was arrested.

The police searched the Dodge Magnum, which had a strong odor of alcohol. They found a red and black baseball cap in rear of the vehicle and a baseball bat in the trunk. They did not find a gun in the vehicle or along the path that the driver had taken.

After transporting defendant to the police station, an officer conducted a gunshot residue test. A criminalist tested these samples and determined that there was gunshot residue on defendant's hands and the sleeves of his sweatshirt.

Detective Clayton Le testified as an expert on criminal street gangs in Santa Clara County. In Detective Le's opinion, defendant was a San Jose Norteno gang member based on the facts of the present case and his previous contacts with the police. Detective Le considered defendant's statements "I'm a Northerner, this is my hood" and "I'm west side," which he made to Cano. He explained that defendant's reference to "west side" indicated that he was a Norteno gang member from the west side of San Jose. According

to Detective Le, "West Side Mob" gang members refer to themselves as "west side" and their territory is near Luther Avenue where the shooting occurred in this case. He also explained that members of San Jose Norteno will use both Northerner and Norteno to describe themselves and that defendant's statement "this is my hood" indicated that he was claiming the neighborhood for his gang. Detective Le testified that Nortenos commonly wear red clothing and both defendant and the driver of the Dodge Magnum were wearing red clothing on the night of the shooting. Detective Le also testified that defendant had been seen with two Norteno gang members, Michael Zapian and Robin Wanes, on prior occasions. There are over 500 members of San Jose Norteno in Santa Clara County.

Detective Le testified that he had conducted investigations involving several Norteno gang members. Ezekiel Tadeo and Justin de la Garza were convicted of assault with a deadly weapon with a gang enhancement after an incident in which a woman's hand was sliced. When police conducted a probation search of Jeremiah Garcia, who had a felony record for possession of narcotics, they found metal knuckles, a shotgun, and a stolen pistol. Robert Ebertowski was convicted of criminal threats with a gang enhancement after he threatened to kill some police officers. Jeremiah Rocho was convicted of attempted murder after he stabbed a Sureno gang member. Detective Le testified that other crimes committed by San Jose Nortenos include homicide, carjacking, shooting into homes or cars, kidnapping, car theft, arson, possession of illegal firearms, vandalism, and drug sales.

Detective Le discussed three prior court cases involving Norteno gang members. When the police were trying to arrest Manuel Fuentes, he retrieved a handgun from his waistband and threw it. Fuentes was convicted of possession of an illegal weapon with a gang enhancement. Armando Mata and Manuel Sandoval stabbed the victim, who had objected to having them in his house. Mata and Sandoval were convicted of assault with a deadly weapon with a gang enhancement. Richard Lopez stabbed a Sureno, who had

4

been sitting in his car in a Norteno neighborhood. Lopez was convicted of attempted murder with a gang enhancement and Britney Elaban was convicted of accessory after the fact with a gang enhancement. Based on the police reports, court documents, and conversations with investigating officers, Detective Le concluded that San Jose Norteno gang members engage in a pattern of criminal activity within the meaning of section 186.22. Detective Le also identified murder, assault with a deadly weapon, illegal possession of a firearm, shooting into an occupied dwelling, and attempted murder as the primary activities of San Jose Nortenos.

The parties stipulated that defendant was the registered owner of a black Dodge Magnum from January 11, 2011 to November 7, 2013. The parties also stipulated: defendant's DNA was located inside the Chicago Bulls baseball cap found in Cano's house; defendant's DNA was located inside the baseball cap found inside his Dodge Magnum; and defendant's fingerprints were on the bottle of Corona beer found on Cano's driveway.

### B. Uncharged Offenses

On December 3, 2011, defendant was listening to loud music in his car while parked in front of his residence. The trunk and the car doors were open and defendant was drunk. Joseph Villalobos asked defendant to move his car and to stop making noise. Defendant became upset and told Villalobos that he "kill[s] people who bother him." Villalobos saw a black baseball bat in the trunk of the car and returned to his residence.

The following day, Villalobos found that his car had been vandalized. The car no longer had windows and was "smashed all over." Villalobos found the aluminum bat, which he had previously seen in defendant's trunk, near his car. He contacted the police.

5

## II. Discussion

## A. Sufficiency of the Evidence

Defendant contends that there was insufficient evidence to support the "primary activities" element of the gang enhancement finding.

"'We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction. [Citation.]'" (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) "[W]e review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

Section 186.22, subdivision (f) defines a "'criminal street gang'" as "a group of three or more persons" that has as "one of its primary activities the commission of one or more of the criminal acts enumerated" in the statute. A criminal street gang must also have "a common name or common identifying sign or symbol" and its members must "engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).)

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.]" (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*).) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*Id.* at p. 324.) "Also sufficient

[to show the gang's primary activities] might be expert testimony," i.e., testimony by a gang expert based on the expert's conversations with gang members, the expert's personal investigations of gang crimes, and information the expert has obtained from other law enforcement officers. (*Ibid.*)

Here, Detective Le testified as an expert regarding criminal street gangs in Santa Clara County. He had received over 175 hours of formal gang training and had been a member of the Gang Investigation Unit for nearly two years. He had participated in over a hundred gang investigations, which involved crimes committed by Nortenos. Detective Le had also talked to over 200 gang members about gangs and gang lifestyles. Detective Le opined that San Jose Nortenos met the definition of a criminal street gang under section 186.22 based on his training, experience, and contact with gang members. His own participation in investigations of Norteno gang members involved those who were convicted of assault with a deadly weapon, illegal possession of a firearm, and attempted murder. He also based his opinion on court records of other Norteno gang members who were convicted of these same offenses. According to Detective Le, other crimes committed by San Jose Norteno gang members included homicide, carjacking, shooting into homes or cars, kidnapping, car theft, arson, possession of illegal firearms, vandalism, and drug sales. Detective Le subsequently identified murder, assault with a deadly weapon, illegal possession of a firearm, shooting into an occupied dwelling, and attempted murder as the primary activities of San Jose Nortenos.[2]

---

[2]  Defendant argues that Detective Le never offered an opinion as to the primary activities of San Jose Nortenos. We disagree. Detective Le testified that section 186.22 defines a criminal street gang as including, among other things, members who "collectively or individually participate in a pattern of criminal activity *whose primary activity is one of the enumerated offenses of 186.22 previously referred to, the murder, the assault with a deadly weapon, illegal possession of a firearm, shooting into an occupied dwelling*." (Italics added.) Detective Le had previously testified that San Jose Nortenos committed these offenses.

Relying on *In re Alexander L.* (2007) 149 Cal.App.4th 605 (*Alexander L.*), defendant argues that there was insufficient evidence of the gang's primary activities. In that case, the expert witness, who had been working in the gang enforcement unit for an unspecified period of time, testified regarding the primary activities of Varrio Viejo: "'I know they've committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.'" (*Id.* at pp. 609, 611.) In concluding that there was insufficient evidence to support the gang enhancement, the Court of Appeal reasoned: "Lang's entire testimony on this point is quoted above—he 'kn[e]w' that the gang had been involved in certain crimes. No specifics were elicited as to the circumstances of these crimes, or where, when, or how Lang had obtained the information. He did not directly testify that criminal activities constituted Varrio Viejo's primary activities. Indeed, on cross-examination, Lang testified that the vast majority of cases connected to Varrio Viejo that he had run across were graffiti related. [¶] Even if we could reasonably infer that Lang meant that the primary activities of the gang were the crimes to which he referred, his testimony lacked an adequate foundation. 'The requirements for expert testimony are that it relate to a subject sufficiently beyond common experience as to assist the trier of fact and *be based on matter that is reasonably relied upon by an expert in forming an opinion on the subject to which his or her testimony relates.* [Citations.]' [Citation.] . . . . We cannot know whether the basis of Lang's testimony on this point was reliable, because information establishing reliability was never elicited from him at trial." (*Alexander L.*, at pp. 611-612, fn. omitted.)

*Alexander L.* is distinguishable from the present case. Here, Detective Le testified regarding his gang training, his conversations with gang members, and his participation in gang investigations in Santa Clara County. As *Sengpadychith*, *supra*, 26 Cal.4th at p. 324 acknowledged, this testimony provided a reliable basis for Detective Le's expert

8

opinion as to the primary activities of the San Jose Nortenos.  Thus, there was substantial evidence to support the primary activities element of section 186.22, subdivision (f).

Defendant also argues that "eight crimes committed by a group of over 500 people proves only 'the occasional commission of those crimes by the group's members,'" quoting *Sengpadychith*, *supra*, 26 Cal.4th at p. 323.  However, defendant overlooks Detective Le's testimony that the primary activities of San Jose Nortenos included some of the offenses enumerated in section 186.22.

## B.  Admissibility of Evidence of Uncharged Offenses

Defendant next contends that the trial court erred when it admitted evidence that he had previously threatened Villalobos and vandalized his car.

### 1.  Background

The prosecutor brought a motion in limine in which he sought the admission of an incident in December 2011.  On that occasion, defendant was playing loud music from his car in front of a residence owned by Villalobos.  When Villalobos told defendant that he could not park his car there while playing loud music, defendant became angry and said that he would "kill people who bother him."  Villalobos noticed that there was a black aluminum bat in defendant's car.  The next day, Villalobos discovered that his car had been vandalized.  He also saw a bat similar to the one that he had seen in defendant's trunk near his car.  The prosecutor argued that this evidence was relevant to prove defendant's intent, motive, and the gang allegation under Evidence Code section 1101.  Defense counsel objected and argued that the evidence was irrelevant and unduly prejudicial.  The trial court admitted the evidence of the uncharged offenses to prove

motive, that defendant committed the charged offenses to benefit the gang, or that defendant acted with the specific intent to kill.[3]

## 2. Analysis

"'Subdivision (a) of [Evidence Code] section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of [Evidence Code] section 1101 clarifies, however, that this

---

[3] Prior to Villalobos's testimony, the trial court instructed the jury pursuant to CALCRIM No. 375: "[T]his is [a] case in which you use evidence for one purpose and not another. You may hear evidence that the defendant committed other offenses, vandalism and criminal threat that was not charged in this case. You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed vandalism and criminal threat. [¶] Proof by a preponderance of the evidence is a different burden than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. If the People have not proved this burden, you must disregard this evidence entirely. [¶] If you decide that the defendant committed vandalism or criminal threat, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not the defendant had a motive to commit the charged offenses or the defendant committed the charged offenses for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members or that the defendant had the specific intent required for count two [attempted murder charge]. [¶] Do not consider this evidence for any other purpose. In evaluating this evidence, consider the similarity or lack of similarity between the vandalism and/or the criminal threat and the charged offenses. [¶] Do not conclude from this evidence that the defendant had a bad character or is disposed to commit crimes. If you conclude that the defendant committed the uncharged act of vandalism and/or criminal threat, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charged crimes. The People must still prove each charge beyond a reasonable doubt. [¶] You will get this instruction again at the end of the case along with all the other instructions. I'm giving this particular one to you now so that you'll know how to treat this evidence. You use it for the limited purpose of deciding whether or not a certain aspect of the charged offenses is true. [¶] The mental state that I refer to, the motive to the committed charged offenses, whether or not the charged offense was for the benefit of a street gang or whether the mental state required for count two is true."

rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition.' [Citation.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 667 (*Fuiava*).) Thus, evidence may be admitted to prove, among other things, intent and motive. (Evid. Code, § 1101, subd. (b).)

"'When reviewing the admission of evidence of other offenses, a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant. [Citation.] Because this type of evidence can be so damaging, "[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded." [Citation.]'" (*Fuiava*, *supra*, 53 Cal.4th at p. 667.) Moreover, the probative value of the uncharged offense must be weighed against the danger "of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

"'"We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." [Citation.]' [Citation.]" (*Fuiava*, *supra*, 53 Cal.4th at pp. 667-668.)

We first consider whether the evidence of the uncharged offenses was admissible to prove intent. "To be admissible, there must be some degree of similarity between the charged crime and the other crime, but the degree of similarity depends on the purpose for which the evidence was presented." (*People v. Jones* (2011) 51 Cal.4th 346, 371.) "The least degree of similarity is required to prove intent or mental state." (*People v. Thomas* (2011) 52 Cal.4th 336, 355.) "In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant '"probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.)

11

The California Supreme Court has explained that the relevance of uncharged offenses to prove intent is based on the doctrine of chances, that is, " 'the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all. . . . In short, similar results do not usually occur through abnormal causes; and the recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' [Citations.]" (*People v. Robbins* (1988) 45 Cal.3d 867, 879-880 (*Robbins*), superseded by statute on another ground as stated in *People v. Jennings* (1991) 53 Cal.3d 334, 387, fn. 13.)  In *Robbins*, the defendant confessed that he had sodomized and choked a young boy to death.  (*Robbins*, at p. 872)  At trial, he tried to establish that he had confessed falsely and though he admitted that he had killed the boy, he claimed that there had been no sexual activity or any sexual motive for the killing, and that the killing was not intentional.  (*Id.* at p. 873.)  *Robbins* held that the evidence that the defendant had previously lured a young boy into his truck, sodomized him, and strangled him was admissible to prove lewd intent and intent to kill.  (*Id.* at pp. 880-881.)

The Attorney General argues that the charged and uncharged incidents in the present case were sufficiently similar so that the jury could reasonably infer that defendant harbored a similar intent in each case, that is, with intent to kill and with the specific intent to promote, further, or assist in criminal conduct by gang members.  She points out that both the charged and uncharged offenses occurred only four months apart in the same neighborhood when defendant was drunk and obnoxious.

We agree that defendant's prior threat to "kill people who bother him" was admissible to prove intent as to counts 1 and 2.  "[A] generic threat is admissible to show the defendant's homicidal intent where other evidence brings the actual victim within the

12

scope of the threat. [Citations.]" (*People v. Rodriguez* (1986) 42 Cal.3d 730, 757 [the defendant's prior threat to kill any police officer who would attempt to arrest him was properly admitted to show intent in shooting two police officers].) However, evidence that defendant had vandalized Villalobos's car was not relevant to prove defendant acted with the intent to kill Cano when he shot at Cano's front door or with the intent to promote criminal conduct by gang members. The Attorney General also notes that defendant was disrespected in his "hood" and defendant overreacted by responding violently in both incidents. However, the charged incident involved defendant's attempt to kill Cano with a gun by firing through his front door while the uncharged incident involved vandalizing Villalobos's car with a bat. Defendant's hitting the victim's car with a bat does not support the inference that defendant intended to kill when he shot at Cano's front door. Moreover, there was no evidence that the uncharged offenses were in any way gang-related. Unlike in *Robbins*, the evidence of defendant's hitting the car with a bat and the charged offenses were not sufficiently similar to support the inference that defendant had the same intent on both occasions. Thus, the trial court erred when it admitted the evidence of defendant's vandalizing the car on the issue of intent to kill. It also erred when it admitted evidence of the uncharged offenses on the issue of the specific intent to promote, further, or assist in criminal conduct by gang members.

In contrast to the issue of the admissibility of uncharged offenses to prove intent, "the probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus. [Citations.]" (*People v. Demetrulias* (2006) 39 Cal.4th 1, 15.)

The Attorney General argues that there was a nexus between the uncharged offenses and the charged offenses, because defendant "reacted violently to feeling disrespected in his gang territory and tried to prove to the neighbors in his 'hood' that their disrespect of him and his gang would not be tolerated." However, the evidence of

the uncharged offenses did not include any references to disrespecting a gang member or his gang, and thus, did not tend to prove defendant's motive as to the charged offenses. Accordingly, it was error to admit the evidence of the uncharged offenses on the issue of motive.

Though we have concluded that the trial court abused its discretion in admitting evidence of the uncharged offenses to show motive, evidence of the vandalism to show intent, and evidence of the uncharged offenses to show intent to promote criminal conduct by gang members, reversal is not required.[4] The erroneous admission of evidence constitutes reversible error only if it resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b).) A reviewing court should declare a miscarriage of justice only when the court concludes it is reasonably probable the defendant would have obtained a more favorable result in the absence of the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

Relying on *People v. Woodward* (1979) 23 Cal.3d 329 (*Woodward*),[5] *People v. Rucker* (1980) 26 Cal.3d 368 (*Rucker*),[6] and *People v. Cardenas* (1982) 31 Cal.3d 897, (*Cardenas*), defendant claims that "[a] long period of deliberation, by itself, is an indication that the error was prejudicial." He points out that the evidentiary portion of the trial lasted about six days and the jury deliberated for about nine hours before returning its verdict.

In *Woodward*, our Supreme Court held that the trial court erred when it allowed a nonparty witness to be impeached with felony convictions that were unrelated to truthfulness. (*Woodward*, *supra*, 23 Cal.3d at p. 340.) Regarding prejudice, *Woodward*

---

[4] Defendant concedes that the error did not affect his conviction for shooting at an inhabited dwelling.

[5] *Woodward*, *supra*, 23 Cal.3d 329, superseded by statute on another ground as recognized by *People v. Castro* (1985) 38 Cal.3d 301, 307-310.

[6] *Rucker*, *supra*, 26 Cal.3d 368, superseded by constitutional amendment on another ground as stated in *People v. Elizalde* (2015) 61 Cal.4th 523, 531.

stated: "The issue of guilt in this case was far from open and shut, as evidenced by the sharply conflicting evidence and the nearly six hours of deliberations by the jury before they reached a verdict. Clearly, the jury had misgivings about [the victim's] identification of [defendant] as the culprit." (*Woodward*, at p. 341.) We agree with *People v. Walker* (1995) 31 Cal.App.4th 432 (*Walker*), which concluded that *Woodard* was not controlling on this point: "We find nothing in [*Woodard*] which relates the length of the jury's deliberations with the length of the trial such that we can make any comparison between the facts of this case and those in *Woodard*. . . . Accordingly, we decline to take Justice Bird's isolated comment that the jury deliberated for nearly six hours as legal authority for us to conclude that because defendant's jury deliberated for nearly six and one-half hours the case was closely balanced such that the exclusion of [a witness's] testimony was prejudicial." (*Walker*, at p. 437.)

*Rucker* and *Cardenas* also do not assist defendant. *Rucker*, *supra*, 26 Cal.3d 368 held that the admission of evidence of two interviews between the defendant and law enforcement to rebut the defense of diminished capacity was error. In determining prejudice, *Rucker* stated: "The question of the degree of [defendant's] criminal liability was not clear-cut since the sole issue presented to the jury was the defense of diminished capacity. The fact that the jury deliberated nine hours before reaching a verdict underscores this fact." (*Id.* at p. 391.) *Cardenas*, *supra*, 31 Cal.3d 897 held that the admission of evidence of the defendant's addiction to heroin as well as the defendant's and several defense witnesses' gang membership was error. (*Id.* at pp. 904, 906, 907.) In discussing prejudice, *Cardenas* reasoned: "This court has held that jury deliberations of almost six hours are an indication that the issue of guilt is not 'open and shut' and strongly suggest that errors in the admission of evidence are prejudicial. (See *People v. Woodard* (1979) 23 Cal.3d 329, 341 . . . .) Here, the jury deliberated twice as long as the jury in *Woodard*, a graphic demonstration of the closeness of this case." (*Cardenas*, at p. 907.) As in *Woodard*, there is no indication in *Rucker* or *Cardenas* as to the length of

15

the trials, and thus we cannot compare the facts of the present case and those in *Rucker* and *Cardenas*. In our view, "the length of the deliberations could as easily be reconciled with the jury's conscientious performance of its civic duty, rather than its difficulty in reaching a decision." (*Walker*, *supra*, 31 Cal.App.4th at p. 439.)

Nor are we persuaded by defendant's argument that the jury's request for readbacks of the testimony of Cano and Chanelle as well as that of the police officers who had interviewed Cano demonstrates that the prosecution case was a close one. Here, the evidence against defendant was overwhelming. Defendant points out that he could not see anyone inside the house when he fired through the front door. However, two witnesses heard defendant call Cano to his front door immediately prior to his firing the gun three times. Thus, the evidence established that defendant was expecting Cano to come to the door when he fired the shots. Moreover, defendant's prior threat to "kill people who bother[ed]" him tended to prove that he acted with the intent to kill Cano, who had asked him to leave his house. Defendant also notes that he had no gang tattoos and had never been previously identified as a gang member. During the incident, defendant was wearing Norteno gang colors and made references to gang membership by stating that he was a Northerner from the west side and by claiming the neighborhood for his gang. In addition, defendant was accompanied by someone wearing Norteno colors on the night of the shooting and he had been seen with two Norteno gang members on prior occasions. This evidence supported Detective Le's opinion that defendant committed the crimes for the benefit of the Norteno gang. Accordingly, it is not reasonably probable that defendant would have obtained a more favorable result in the absence of the erroneous admission of the evidence of the uncharged offenses. (*Watson*, *supra*, 46 Cal.2d at p. 836.)[7]

---

[7]    The strength of the evidence against defendant in the present case renders it factually distinguishable from *People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295 and

(*Continued*)

16

Defendant also argues that the lack of probative value of the uncharged offenses evidence and its highly prejudicial nature deprived him of his federal due process right to a fair trial.

"[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair.* [Citations.]" (*People v. Partida* (2005) 37 Cal.4th 428, 439.) "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." (*Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920.) In our view, the evidence of the uncharged offenses was not so prejudicial that it rendered his trial fundamentally unfair.

### III.    Disposition

The judgment is affirmed.

---

*People v. Williams* (1971) 22 Cal.App.3d 34, 38-40. Defendant's reliance on *People v. Hernandez* (1988) 47 Cal.3d 315 (*Hernandez*) is also misplaced. At issue in *Hernandez* was whether CALJIC No. 8.75 included ambiguous language that had infected jury deliberations. (*Hernandez*, at pp. 351-352.) It was in this context that *Hernandez* noted that there was "no indication of disagreement or deadlock, no request to the court for further instructions or the rereading of particular testimony." (*Id.* at p. 352.)

17

_____

Mihara, J.

WE CONCUR:


_____

Bamattre-Manoukian, Acting P. J.


_____

Grover, J.