Filed 3/4/14  P. v. Garcia CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ELENAR LUA GARCIA,<br><br>    Defendant and Appellant. | G047402<br><br>(Super. Ct. No. 11CF0499)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Francisco P. Briseno, Judge.  Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, and Sean M. Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Elenar Lua Garcia of aggravated sexual assault on a child under 14 years of age, forcible lewd act on a child under 14, and lewd act on a child under 14 years of age with force greater than that necessary to accomplish the lewd act itself. The trial court sentenced Garcia to a total term of 23 years to life in state prison.

Garcia alleges the judgment must be reversed because the trial court erroneously found no discovery violations were committed by the prosecution, the trial court improperly allowed into evidence a threat by Garcia to kill S.C. if she had a boyfriend, and the prosecutor engaged in misconduct. We find no error and affirm.

## FACTS

The offenses were all committed against S.C., who was 16 years old at the time of trial. Garcia is S.C.'s stepfather. S.C. was born in Mexico in July 1996 and lived there with her mother (mother). When S.C. was a young child, mother left S.C. in Mexico with her grandmother, moved to the United States and married Garcia. Garcia and mother ultimately had several daughters together, all younger than S.C., including E.G.

When S.C. was seven years old, Garcia, mother, E.G., and a second daughter moved to Pennsylvania. A few months thereafter Garcia brought S.C. to live with them. Garcia began hitting her with a belt if she did something wrong. S.C. was afraid of Garcia. Garcia also hit E.G. They lived in Pennsylvania for four years.

*1. Tamy Lane Incidents*

When S.C. was 11 years old, the family moved to Santa Ana and lived for about two months with Garcia's sister, Rosalinda. Garcia's family shared one bedroom. Rosalinda and her family, including her son Gerardo and his wife, stayed in another bedroom. Rosalinda's brother Jesus and his family stayed in the garage. Garcia's parents slept in the living room.

In the Garcia family bedroom, Garcia, mother and one daughter slept in one bed, and S.C., E.G. and another daughter slept in the adjacent bed. Mother worked

2

weekend days and some weekdays at a hotel. Her mother-in-law and sister-in-law would babysit. Garcia watched the children on the weekends.

S.C. testified Garcia sexually abused her several times while the family lived with Rosalinda. The first incident occurred when her sisters were in the backyard playing with their pet dogs. Rosalinda was home at the time but mother was not. S.C. was watching television alone in the Garcia family bedroom. Garcia entered and closed the door behind him. S.C. could tell Garcia wanted to "do something to [her]." She told him "no," and that her sisters were outside. Garcia told S.C. not to worry, and said her sisters were too young to understand what was happening. He warned S.C. that if she said anything, Luz would leave her, and S.C. would have to live with him. Garcia pulled S.C.'s shorts down to her knees, unzipped his pants, and took out his penis. S.C. tried to push him off, but she was unable to do so and Garcia forced his penis into her vagina. When S.C. said she wanted it to end, Garcia told her to be quiet and hit her in the face.

S.C. testified Garcia sexually abused her another time when her sisters were playing outside. Again Garcia entered the bedroom when S.C. was alone, but he was interrupted when her cousins came home and entered the house.

S.C. testified about a third incident when she was in the bedroom wearing a long shirt and leggings. Mother was not home. Garcia entered the bedroom and closed the door. S.C. threatened to scream, but Garcia warned her she was going to "suffer the consequences." Garcia told S.C. that mother was going to leave her, and said S.C.'s sisters would be forced to grow up without a father. Garcia pulled S.C.'s leggings down, but he was unable to do anything else because mother came home.

2. *Joane Way Incidents*

Garcia and his family moved to a house on Joane Way, where they lived for approximately 14 months. Garcia's family again shared one bedroom and Garcia's parents resided in another. In the Garcia family bedroom, S.C., E.G., and another daughter all slept in a bunk bed. Garcia, mother and a third daughter slept in another bed.

3

When the fourth daughter was born, she shared the bed with Garcia and mother, and S.C., E.G., and two other daughters slept together.

S.C. testified she fought with her sisters to sleep on the top bed so Garcia could not have sex with her. E.G. testified Garcia reached into S.C.'s covers when S.C. slept on the top bed. S.C. testified that when Luz would wake up early in the morning to make Garcia's lunch, Garcia would take off S.C.'s pants and have sex with her. S.C. was afraid of Garcia, who raped her on multiple occasions when she slept on the bottom bed.

*3. Ninth Street Incidents*

Garcia and his family moved to a duplex on Ninth Street. S.C. was in eighth grade. Garcia and mother shared a bedroom with their then youngest daughter. S.C. shared another bedroom with E.G. and two other daughters and they all slept together on a queen size mattress.

S.C. changed the knob on her bedroom door so she could lock it and prevent Garcia from entering the room. However, Garcia took one of the keys. Mother became suspicious when she learned Garcia kept a key to the room on his key ring.

One day, while mother was out and S.C.'s sisters played outside, Garcia called S.C. into his bedroom. Garcia wanted to "do his usual routine," which was to have sex with S.C. S.C. said she did not want to, and Garcia hit S.C. with his belt. He made her have sex with him and she cried.

One night in November, 2010, when S.C. was 14 years old, Garcia came home late, smelling of beer, and tried to have sex with her. S.C. told Garcia to leave, but he refused. S.C. tried to push Garcia off her. However, he was able to insert his penis into her vagina.

Mother thought it was odd that Garcia had not promptly come to bed. She decided to investigate. Mother entered her daughters' room, where she found S.C. without her pants or underwear on. When mother entered the room, Garcia attempted to

4

hide behind the bedroom door and close the zipper on his shorts. Mother cried and returned to her own bedroom.

Garcia came into mother's bedroom with a knife in his hands, and told her if she thought he did something wrong, she should kill him. He initially said he did not sexually abuse S.C. However, he later admitted touching S.C., and said he would never touch her again. Mother did not call the police because she did not want her daughters to be taken away from her.

E.G. testified she witnessed similar incidents. While she and her other sisters played, Garcia and S.C. would go into the bedroom together and Garcia would lock the bedroom door. When E.G. later walked into the room, she would see Garcia pulling up his pants. S.C. would leave the room crying. E.G. saw this happen "a lot" at the house on Joane Way, and they "would do the same thing" while living on Ninth Street.

Garcia told E.G. not to tell mother what she saw, and warned her that if she said anything, he would hit her. E.G. initially denied having seen any abuse because she was scared she would be taken away from mother.

4. *Other Evidence*

In November 2010, S.C. met and began dating someone she met on MySpace (the boyfriend). Garcia became upset when he found out about the relationship in February, 2011. He threw his phone charger at S.C., hit her, and struck her with a VCR cord until she cried and bled. He told her that if she got into a relationship with someone else he would kill her "because [she] was only going to be his and no one else's." Mother told Garcia he was treating S.C. like a beast, so he stopped hitting her and walked out. Garcia told mother that if she told the police he hit S.C., he would take her daughters away or leave the house.

Shortly after Garcia beat S.C. with the VCR cord, Garcia kicked S.C. out of the house. After getting kicked out of the house, S.C. went to the boyfriend's aunt's

5

house.  S.C. called mother and told her she was tired of being mistreated.  S.C. specifically talked about the sexual abuse.

The boyfriend's aunt asked S.C. about the bruises on her body from the VCR cord.  S.C. told her she had been sexually abused, and the aunt drove her to the Costa Mesa Police Department on February 15, 2011.

The same day S.C. was taken to Orangewood and later placed in a foster home.  At Orangewood, photographs were taken of S.C's bruises from Garcia hitting her with the VCR cord.

## 5.  *Statements to Police*

Santa Ana Police Officer Aguilera interviewed S.C. on February 15, 2011.  S.C. disclosed the sexual abuse incidents at the Joane Way and Ninth Street houses, but not at the Tamy Lane house.  Mother told Officer Aguilera she did not call the police when she found Garcia in the room with S.C. because she did not actually "catch" them doing anything.  S.C. told Officer Aguilera she did not talk to mother about that incident, and mother did not ask her any questions about it.  Officer Aguilera also spoke with E.G., who claimed she was a sound sleeper, and denied seeing any inappropriate contact between Garcia and S.C.

Santa Ana Police Detective Alan Gonzalez interviewed S.C. on March 24, 2011.  S.C. described three instances in which Garcia sexually assaulted her at the house on Tamy Lane, seven instances at the house on Joane Way, and six instances at the duplex on Ninth Street.  S.C. said most of the incidents were similar and she was afraid of Garcia.

The day Garcia was arrested, mother told several police officers she had walked in on S.C. and Garcia in the bedroom and S.C. was naked.

## 6.  *Defense Witnesses*

Garcia's nephew, Gerardo Lua, never saw any sexual contact between Garcia and S.C. when he lived with them on Tamy Lane.  In conversations with mother a

6

few days after Garcia's arrest and two weeks later, mother did not tell Gerardo she had seen anything that made her believe Garcia was sexually abusing S.C. Gerardo never saw Garcia hit S.C. or his children, although he heard Garcia hit his children "once in a while."

Garcia's brother, Jesus Lua, also lived with Garcia and his family at the Tamy Lane house. In conversations with mother after Garcia was arrested, mother told Jesus she never saw anything inappropriate between Garcia and S.C. She did not tell him she had seen Garcia in S.C.'s bedroom dressing and hiding behind a door while S.C. was undressed. Jesus did not see Garcia hit S.C., but mother told him Garcia had done so.

## PROCEDURAL HISTORY

On July 31, 2012, the day before both parties answered ready for trial, the prosecutor's investigator met with Luz to discuss the trial process and provide her with a courtroom tour. Mother told the investigator that E.G. recently told mother she had seen something inappropriate between Garcia and S.C. E.G. had previously said she had not seen anything inappropriate. The prosecutor gave this information to defense counsel later that day.

On August 6, 2012, during discussions on pretrial matters and before the jury was selected, the prosecutor told the trial court that E.G. had been added to the prosecution witness list, because of what mother had said to the prosecutor's investigator. The prosecutor said E.G. "was interviewed when we first did the investigation on this case, and she said she had not seen anything, and so now when she [mother] told my investigator that . . . I let defense counsel know about that."

The prosecutor explained: "We have not interviewed her. She is – she has cancer, and she is . . . in the hospital . . . . but . . . if there is a claim being made that, look, all these sex acts were happening in a bedroom where there were four other children and none of them ever witnessed anything, then I wanted to put the defense on notice that this witness, [E.G.] has said she has seen something . . . ."

7

Defense counsel responded: "My biggest concern is, since we don't know the nature of what she [E.G.] is alleging . . . . we're not facing a fair trial. The reason why is because they have at least had the opportunity to speak [with E.G.]." "She [E.G.] will not speak to us." "We should be provided with whatever discovery she [the prosecutor] has or is within her possession at this point."

On the morning of August 7, 2012, the day jury selection commenced, the prosecutor's investigator interviewed E.G. The interview was reduced to writing and that writing, together with an audio recording of the interview, were provided to defense counsel about 3:00 p.m. that afternoon.

On August 8th, 2012, defense counsel moved to exclude E.G.'s testimony, on the grounds the prosecutor had failed to comply with her discovery obligations under Penal Code section 1054 et seq., and had deprived Garcia of his due process right to a fair trial. That same day, before the first witness was called, the trial court heard argument, and denied the motion, finding no discovery or due process violation had occurred. However, the trial court did permit defense counsel to voir dire E.G. before she testified in front of the jury.

On the morning of August 13, 2012, before opening statements, the prosecutor learned of the photographs of S.C. had been taken when she was at Orangewood on February 15, 2011. The prosecutor told defense counsel about them and showed them to defense counsel, before seeking to use them during her direct examination of S.C. In chambers, defense counsel objected that "under [Evidence Code section] 352 not all of them should be shown. This is all information, again, that I'm getting last minute. I'm being told about these pictures and shown these pictures well within the trial . . . ." The trial court instructed the prosecutor to make no reference to these photographs.

Later that afternoon, on redirect examination after the defense cross-examined S.C., the prosecution again sought to show these photographs to S.C. Outside

8

the presence of the jury, the trial court asked if defense counsel wished to be heard further. Defense counsel responded, "No, your honor. I'll submit to my arguments that were made in chambers." The trial court ruled, "I'm going to allow counsel to show those photographs to the witness."

In the presence of the jury, the prosecutor then showed S.C. these photographs and questioned her about them. Also, with permission from the trial court and without objection from defense counsel, the prosecutor showed these photographs to the jury. And, at the close of evidence, over defense counsel's late discovery objection, these photographs were admitted into evidence.

## DISCUSSION

*1. Late Discovery and Due Process Claims*

Garcia contends the trial court erred in finding no discovery or due process violations by the prosecution in connection with the testimony of E.G. and the photographs of S.C's bruises. These contentions are founded upon the California criminal discovery statutes (Pen. Code, § 1054[1], et seq.) and the Fourteenth Amendment to the United States Constitution. We find no error.

There is no dispute the discovery statutes required the prosecutor to disclose to the defense (a) the possibility E.G. would be called as a witness at trial, (b) mother's statements to the prosecutor's investigator on July 31, concerning what E.G. had recently told mother, (c) E.G.'s statements to the prosecutor's investigator during the interview on August 7, and (d) the photographs of S.C.'s injuries, which were taken at Orangewood. (§ 1054.1 subds. (a), (c), & (f).) The dispute concerns the timeliness of these required disclosures.

Garcia points out section 1054.7 states such disclosures "shall be made at least 30 days prior to the trial." He notes this duty of disclosure is intended to facilitate

---

[1]     All further undesignated statutory references are to the Penal Code.

9

the ascertainment of truth and is based on the fundamental proposition that the accused is entitled to a fair trial and an intelligent defense in light of all relevant and reasonably accessible information. And he observes the trial court has the power to exclude the late disclosed evidence as a last resort, in the event the 30-day rule is violated. All of this is most certainly true, but equally irrelevant.

Garcia ignores the fact that section 1054.7 also states, "If the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately." Of course, this is what happened here. mother's statements to the prosecutor's investigator on July 31 were disclosed to the defense on the same day, one day before the parties answered ready for trial. E.G. was then added to the prosecutor's witness list, even though she had not been reinterviewed, and the matter was discussed with the trial court and defense counsel on August 6, the day before jury selection commenced. Although she had been in the hospital, E.G. was reinterviewed on the morning of August 7, and a copy of the recorded interview as well as a transcript of the interview were given to the defense by 3:00 p.m. that day, one day before jury selection was concluded.

Similarly, the photographs of S.C.'s injuries taken at Orangewood became known to and came into the possession of the prosecutor on August 13, and were disclosed to the defense the same day, before S.C was questioned about them. These photographs were taken 18 months earlier, but there is no clear indication in the record that prior to August 13 they were known to, or in the possession or control of the "prosecuting attorneys, law enforcement agencies which investigated or prepared the case against the defendant, or any other persons or agencies which the prosecuting attorney or investigating agency may have employed to assist them in performing their duties." (§ 1054.5, subd. (a); see also *In re Littlefield* (1993) 5 Cal.4th. 122, 135.)

Thus, the trial court correctly ruled there was no violation of the discovery statutes and no case cited by Garcia supports his claim to the contrary. This does not,

however, resolve the matter completely. As Garcia correctly observes: "Under the due process clause of the Fourteenth Amendment to the United States Constitution, the prosecution has a duty to disclose all substantial material evidence favorable to an accused, including evidence bearing on the credibility of a prosecution witness; the duty exists whether or not the evidence has been requested, and it is violated whether or not the failure to disclose is intentional." (*People v. Hayes* (1990) 52 Cal.3d 577, 611.)

Here again there is no dispute such a duty exists, but rather whether the prosecutor complied with that duty. We believe she did. The two principal cases relied upon by Garcia do not suggest otherwise.

In *People v. Filson* (1994) 22 Cal.App.4th 1841 (disapproved on another ground in *People v. Martinez* (1995) 11 Cal.4th 434, 452) the defendant was convicted of committing a lewd act on a child under 14. During trial, defense counsel realized the prosecutor had a second tape recorded statement made by the defendant that had not been produced. Defense counsel asked the trial court to order the prosecutor to produce it. The prosecutor did not deny having the statement, but explained he had not produced it because defense counsel had not made an informal discovery request for it.

The trial court in *Filson* refused to order the prosecutor to produce the statement, and the appellate court found that refusal was a violation of the defendant's due process rights. "Contrary to what the prosecutor intimated to the trial court, the absence of a defense request for the tape was irrelevant to the prosecution's independent duty of disclosure." (*People v. Filson, supra,* 22 Cal.App.4th at p. 1848.) "The tape having met the test for material evidence, it was clear error for the prosecution to withhold it from the defense, and equally clear error for the trial court not to order it produced for the defense." (*Id*. at p. 1849.) "The net effect was to hobble defendant's ability to challenge a crucial prosecution witness and to present independent, objective, and admissible evidence for the sole defense theory." (*Id.* at p. 1852.)

11

The case at bar is factually and legally distinguishable from *Filson*. Nothing in the record before us suggests the prosecutor had any of the disputed evidence, and withheld it from the defense. To the contrary, it is clear the prosecutor had no reason to believe E.G. had seen anything inappropriate between Garcia and S.C., until mother told the prosecutor's investigator E.G. had changed her story. That same day the prosecutor told defense counsel, and the next day both parties answered ready for trial. Furthermore, as soon as E.G. was reinterviewed, the prosecutor gave defense counsel a recording and transcript of that interview. As a result, defense counsel was able to cross-examine E.G. extensively about why she changed her story.

Likewise, there is no indication in the record that the prosecutor was even aware the photographs of S.C. had been taken, until the morning opening statements were set to begin. That same day, before opening statements, the prosecutor told defense counsel about the photographs. And later that day, before seeking to use them during her direct examination of S.C., the prosecutor showed the photographs to defense counsel. Defense counsel was then able to cross-examine S.C. about the photographs. Therefore, in this case, unlike in *Filson*, there was no due process violation.

The other main case Garcia cites, *U.S. v. Lanoue* (1st Cir. 1995) 71 F.3d 966 (abrogated on other grounds in *U.S. v. Watts* (1997) 519 U.S. 148), is also inapposite. In *Lanoue*, the government failed to disclose the defendant's recorded statements. (*U.S. v. Lanoue, supra,* 71 F.3d at p. 971.) The appellate court made no finding as to whether the defendant's constitutional rights were violated, but instead found a violation of a federal rule of evidence. (*Id*. at p. 977.) Here, the issue is not whether a federal rule of evidence was violated, but whether Garcia's constitutional rights were violated. And in this case, unlike in *Lanoue*, the disputed evidence was promptly disclosed to the defense. As a result, Garcia was not harmed by any delay in disclosure.

Lastly, although Garcia does not rely directly on *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), we feel it is important to explain why no *Brady* violation occurred.

12

"'There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' [Citation.] Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt or innocence.' [Citations.] Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible . . . . A defendant instead 'must show a "reasonable probability of a different result."' [Citation.]" (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043.)

None of these *Brady* components is present in this case. Neither the testimony of E.G. nor the photographs of S.C.'s bruises was favorable to Garcia, either because the evidence was exculpatory or was impeaching. Furthermore, as discussed above, we do not believe the evidence was suppressed by the prosecutor, either willfully or inadvertently. And, it does not appear prejudice has ensued, because Garcia has not shown a reasonable probability of a different result. In fact, Garcia has not even seriously argued otherwise. His alleged surprise is unavailing. As the trial court put it "trial attorneys have to be prepared for these kinds of contingencies."

## 2. *Death Threat Evidence Claims*

Garcia contends the trial court erred by allowing into evidence Garcia's threat to kill S.C. if she had a boyfriend, and S.C.'s fear Garcia would carry out that threat. Garcia further claims these alleged errors deprived him of his constitutional right to a fair trial. We disagree.

In order to properly analyze these claims, we must first recount what S.C. testified to and the objection defense counsel made.

"Q. Did Mr. Garcia ever tell you anything about if you were to get a boyfriend, what would happen?

13

"A. He told me if I have a boyfriend or if I were getting into a relationship with someone, that he would kill me, because I was going to be his and no one else's. [¶] . . . [¶]

"Q. And how did that make you feel?

"A. I was scared, because I never had a boyfriend, and once he, like when he got really really mad, he would probably do it.

"Q. You thought he would kill you?

"A. Yes.

"[Defense Counsel]: Objection. Relevance, your honor.

"The Court: Overruled. I'll let the answer stand."

We observe defense counsel did not object to S.C.'s testimony about the death threat itself. Rather, the objection was limited to S.C.'s testimony that she thought Garcia would kill her, and the only stated grounds for that objection was relevance. These observations are important, because Garcia's claims of error about the death threat itself, and Garcia's other objections to S.C.'s testimony, have all been forfeited by defense counsel's failure to make those specific objections. (Evid. Code, § 353, subd. (a); see also *People v. Bolin* (1998) 18 Cal.4th 297, 321.)

What remains to be analyzed is Garcia's claim the trial court erroneously overruled the relevance objection to S.C.'s testimony she thought Garcia would in fact kill her. According to Garcia, what S.C. thought about the death threat was irrelevant, because the death threat occurred in February 2011, and the charged crimes were all committed before July 27, 2010.

Relevant evidence is evidence "'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'" (*People v. Scott* (2011) 52 Cal.4th 452, 490, quoting Evid. Code, § 210.) "The issue of the relevance of evidence is left to the sound discretion of the trial court, and the exercise of that discretion will not be reversed absent a showing of abuse. [Citations.] That

14

discretion is only abused where there is a clear showing the trial court exceeded the bounds of reason . . . . [Citations.]" (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 32.)

Applying these principles to the facts of this case, it is evident there was no error or abuse of discretion.  Taken in context, S.C.'s testimony she thought Garcia would in fact kill her was relevant.  That testimony, together with her testimony Garcia said he would kill her because she was going to be his and no one else's, and her testimony she was scared because once Garcia got really, really mad he would probably do it, all had some tendency in reason to prove the act and intent elements of the charged crimes.  (See CALJIC Nos. 10.55, 10.00, 10.42, and 10.42.5.)  It also corroborated other evidence those crimes were accomplished through the use of duress, violence, or fear.

Finally, Garcia contends S.C.'s testimony regarding the death threat, how she felt about it, and whether she believed it, should all have been excluded under Evidence Code section 352 because it was more prejudicial than probative and violated Garcia's constitutional rights.  Preliminarily, we note Garcia's Evidence Code section 352 claim was also forfeited by defense counsel's failure to make that specific objection at trial.  But even if that claim was preserved for appellate review, we would reject it on the merits.

Evidence may only be excluded under Evidence Code section 352 if its probative value is substantially outweighed by the probability that its admission will create substantial danger of undue prejudice.  "Evidence is not 'unduly prejudicial' under the Evidence Code merely because it strongly implicates a defendant and casts him or her in a bad light . . . .  Instead, undue prejudice is that which 'uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues.'  [Citations.]" (*People v. Robinson* (2005) 37 Cal.4th 592, 632.)

On the one hand, the probative value of S.C.'s testimony on these points was high.  For example, Garcia's statements he would kill S.C. if she were to have a

15

boyfriend or get into a relationship, because she was going to be his and no one else's, all amounted to an admission Garcia had sexually abused S.C. in the past using duress, violence, and fear, and that he had done so to appease his own prurient interests. They also demonstrated the extent of Garcia's continuing intent to sexually abuse her.

On the other hand, the danger of undue prejudice resulting from S.C.'s testimony was not substantial. Nothing suggests S.C.'s testimony Garcia threatened to kill her, she was afraid, and she believed his threat uniquely tended to invoke an emotional bias against Garcia. Our conclusion is strengthened when the challenged testimony is viewed in the light of other evidence Garcia had threatened and had actually been violent with S.C. and other family members on prior occasions. And here, as in *Robinson*, while the evidence is very disturbing, "the jury properly was instructed not to be influenced by passion, sympathy, or prejudice and to conscientiously consider and weigh the evidence in applying the law." (*People v. Robinson, supra,* 37 Cal.4th at p. 632.)

In sum, the trial court did not err in overruling the defense's relevance objection and admitting S.C.'s testimony about the death threat into evidence. The testimony was relevant to the issues in the case and was not unduly prejudicial. Under these circumstances, Garcia's constitutional right to a fair trial was not infringed.

*3. Prosecutorial Misconduct Claims*

Garcia asserts the prosecutor committed misconduct by eliciting testimony in violation of an earlier evidentiary ruling by the trial court, by misstating the evidence in closing argument, and by failing to timely disclose the testimony of E.G. and the photographs of S.C.'s bruises. Garcia further asserts this misconduct deprived him of his California and federal Constitution rights to a fair trial. We discern no error.

*a. No Violation of Trial Court Ruling*

Before trial the prosecutor sought permission to introduce evidence of prior uncharged sex offenses by Garcia against S.C., which were allegedly committed while

16

the family was living in Pennsylvania.  Defense counsel filed written opposition.  The trial court conducted an Evidence Code section 402 hearing and ordered the evidence excluded under Evidence Code section 352.  The court told the prosecutor to admonish S.C. "not to volunteer any testimony reference that time frame and her relationship with the defendant."

At trial, during the prosecutor's direct examination of S.C. about one of the Ninth Street house incidents, the following exchange occurred:

"Q.  Where was your Mom?

"A.  She was at the doctor.

"Q.  Do you remember at what point she came home that day?

"A.  She heard us [S.C. and E.G.] crying outside.

"Q.  Did you tell your Mom why you were crying?

"A.  No, I never told her anything.  We had a really bad relationship.

"Q.  Why?

"A.  Because before she knew what was going on and she never did anything about it.

"[Defense Counsel]:  Objection, your honor.  May I be heard at sidebar?

"The Court:  Make a note of it.  We will discuss it outside the presence of the jury."

A short time later, after the jury was excused for lunch, defense counsel said, "There was one thing that [S.C.] did mention, and I believe it was a violation of a court order elicited by the prosecution.  One of the questions asked about her relationship with her mother, and S.C. stated that her mother didn't protect her because she knew about it from before.  [¶]  My biggest concern is that I think that the district attorney is eliciting things that they know will have some type of response in direct contradiction to what the [Evidence Code section] 402 motions were regarding Pennsylvania."

17

The court asked, "Was that the nature of the objection then?" Defense counsel responded, "That was the nature of the objection. I didn't want to say it then, because I didn't want to highlight it any more. I would ask the court to caution the district attorney's office regarding that." The court replied, "At this stage I'm not finding any violation of the court's prior order. The dialogue had to do with why she felt her relationship was bad with her mother, and to the extent she responded, I think it's relevant and I'll let it sit there. I don't want to go [into] what took place in Pennsylvania, obviously, between her and her mother in that regard. So care as to be exercised. So far I think we're all right."

We agree with the trial court. There was no violation of the court's prior order. Nothing suggests the prosecutor intended to solicit a response in violation of the order. And, as the Attorney General points out, before S.C. testified, she agreed to only testify about what occurred after the family moved to Santa Ana. Furthermore, the record reflects S.C. had many reasons for not getting along with mother that had nothing to do with the prior sexual abuse. For example, mother was aware Garcia began physically (not sexually) abusing S.C. shortly after S.C. came to the United States. The jurors may have believed this is what S.C. was referring to when she said mother "knew what was going on." S.C. also testified she did not talk to mother because she did not stand up for herself, and mother allowed Garcia to treat her "like a slave." It follows there was no prosecutorial misconduct.

### b. No Misstatement of the Evidence

"If a prosecutorial misconduct claim is based on the prosecutor's arguments to the jury, we consider how the statement would, or could, have been understood by a reasonable juror in the context of the entire argument. [Citations.]" (*People v. Woods* (2006) 146 Cal.App.4th 106, 111.) "'"[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the

evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]"'" (*People v. Ward* (2005) 36 Cal.4th 186, 215.)

In this case, during closing argument, the prosecutor argued: "Now we are moved all the way across the country to the defendant's family, a man who beats her. Now we are going to go hang out with his family and live with his family, people like Gerardo and Jesus that you saw come and testify, who they thought that the relationship was completely normal between father – between father kind of daughter relationship. I guess to them beating your kids is normal. I don't know, but that's who she is living with." Defense counsel objected, "misstates the evidence." The trial court overruled the objection and allowed the prosecutor to continue.

Garcia claims that, "by telling the jury that Gerardo and Jesus thought beating one's children was normal, the prosecutor intentionally misstated the evidence. The prosecutor had to have known when making this comment that there was no evidence of Gerardo and Jesus saying this." Not so. Although neither Gerardo nor Jesus testified he had seen Garcia hit his children, Gerardo said he had heard stories that Garcia used to hit his children "once in a while." ~(3 RT 400.)~ And Jesus testified mother told him Garcia hit his children. But Gerardo and Jesus both testified they had never seen anything inappropriate between Garcia and his children. So the comment that Gerardo and Jesus thought "beating your kids is normal" was well within the wide latitude given in closing argument. Again, there was no prosecutorial misconduct.

### c. *No Failure to Timely Disclose Evidence*

Finally, Garcia avers the prosecutor committed misconduct by not timely disclosing the testimony of E.G. and the photographs of S.C.'s bruises. We discussed this evidence above in rejecting Garcia's contention the trial court erred in finding no discovery or due process violations by the prosecution. As we explained, there was no "late" disclosure as Garcia contends. Furthermore, nothing in the record suggests the

19

prosecutor used "'"deceptive or reprehensible methods" [or] the challenged action "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" [Citation.]' [Citation.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 679.) Under these circumstances we perceive no prosecutorial misconduct.

## DISPOSITION

The judgment is affirmed.


THOMPSON, J.


WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.