Filed 5/27/26  P. v. Villa CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LUIS MARTINEZ VILLA,<br><br>Defendant and Appellant. | F089038<br><br>(Super. Ct. No. CR-24-000974)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>[NO CHANGE IN JUDGMENT] |

**THE COURT:**

Pursuant to California Rules of Court, rule 8.264(c), it is ordered that the opinion herein filed on April 30, 2026, be modified as follows:

1. On page 5, after the third full paragraph that starts with "Before trial" and ends with "disclosed it," the following paragraph is added:

> During closing argument, the prosecution argued to the jury that defendant was the person in the surveillance footage taking the items.  The prosecution noted the surveillance footage would be made available for the jury's review and requested the jury "go through the surveillance in its entirety" and "[l]ook through it as many times" as needed.  The prosecution also noted a screenshot from the surveillance footage would be provided but asserted the screenshot "might not be as good as the video," and urged the jury to "go back and watch that video."  The prosecution told the jury that "this is your community," and asked:  "Are you going to hold [defendant] accountable or are you going to fall for word play and little tricks about, oh, you know, parts of the surveillance are fuzzy[?]"

2. On page 5, under the subheading "**A.  Additional Background**" the one-sentence paragraph that reads:  "During closing argument, defense counsel stated, in part:" is modified to read as follows:

> Defense counsel stated during his closing argument, in part:

3. On page 8, before the second full paragraph that begins with "The jury began," the following paragraph is added:

> During rebuttal, the prosecution stated, in relevant part:  "That is [defendant] in the surveillance and you know it."

4. At the end of the last paragraph on page 10, after the sentence ending "circumstances of this case," the following sentence is added:

> Moreover, the prosecutor's statements in closing arguments were fair comments on the evidence presented.

5. On page 11, footnote 6 is deleted, which will require renumbering of the subsequent footnote.

There is no change in the judgment.  (Cal. Rules of Court, rule 8.264(c)(2).)

Appellant's petition for rehearing filed May 12, 2026, is hereby denied.

DETJEN, Acting P. J.

WE CONCUR:

PEÑA, J.

HARRELL, J.

2.

Filed 4/30/26  P. v. Villa CA5 (unmodified opinion)


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>LUIS MARTINEZ VILLA,<br><br>    Defendant and Appellant. | F089038<br><br>(Super. Ct. No. CR-24-000974)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Maria Elena Ramos Ratliff, Judge.

Robert F. Kane, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary and Joseph Penney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Luis Martinez Villa was convicted of one count of grand theft and two counts of petty theft. On appeal, defendant argues the trial court (1) prejudicially erred by prohibiting defense counsel from showing the jury a slideshow of celebrities during closing argument, and (2) abused its discretion by refusing to dismiss his prior "strike" conviction within the meaning of the "Three Strikes" law (Pen. Code, §§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d))[1] under section 1385 and *Romero*.[2] We affirm.

## PROCEDURAL SUMMARY

On May 10, 2024, the District Attorney of Stanislaus County filed an information charging defendant with grand theft (§ 487, subd. (a); counts I & II) and petty theft (§ 484, subd. (a); count III). As to counts I and II, the information alleged defendant had suffered a prior strike conviction (§ 667, subd. (d)). The information further alleged the circumstances in aggravation that defendant's prior convictions were numerous or of increasing seriousness (Cal. Rules of Court, rule 4.421(b)(2)) and defendant had served a prior prison term (*id.*, rule 4.421(b)(3)).

On October 14, 2024, a jury convicted defendant of one count of grand theft (count II) and two counts petty theft (counts I & III).[3] In a bifurcated proceeding, the jury found true defendant's prior strike conviction allegation. The trial court granted the prosecution's motion to strike the circumstances in aggravation in the interest of justice.

The trial court sentenced defendant to two years on count II, which was doubled to four years under the Three Strikes law. The court further sentenced defendant on counts I and III to 90 days each, to run concurrent with the sentence on count II.[4]

---

[1] All further undesignated statutory references are to the Penal Code.

[2] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).

[3] Although count I was charged as grand theft (§ 487, subd. (a)), the jury found defendant guilty of the lesser included offense of petty theft (§ 484, subd. (a)).

[4] The court then terminated defendant's probation in Stanislaus County Superior Court case No. CR-23-000657 for violating the terms of probation and imposed the

Defendant filed a timely notice of appeal.

## FACTUAL SUMMARY

**Count I**

A person was captured on surveillance footage entering a sporting goods store in Turlock on November 19, 2023, taking at least five items of merchandise totaling $1,250, and running out of the store without purchasing the items. A loss prevention manager of the store reviewed the surveillance footage from multiple cameras from different areas of the store and identified the person as defendant. Although the person was wearing a mask covering his face, the surveillance footage captured defendant pulling down his mask for a moment. The manager noticed the person's "distinct features," including his forehead, nose, hairline, mouth, and eyebrows. Before trial, the manager identified defendant in a "six-pack" lineup. The manager testified in court she was "[a] hundred percent" confident that the person in the surveillance footage was defendant.

**Count III**

On December 6, 2023, at a clothing store in Turlock, an employee observed a person walk into the store and walk "straight to the back" of the store. The employee saw the person's face when he entered the store. The person was wearing a jacket and shorts. The employee reviewed the store's surveillance footage and saw this person grab one piece of merchandise before placing it into his jacket. After someone approached him, the person grabbed multiple items of merchandise and ran out of the store. Once out of the store, the person got into a red SUV (sport utility vehicle) and disappeared out of the surveillance camera's view.

Prior to testifying, the employee was given a six-pack lineup. The employee reviewed the surveillance footage "over and over" and, once he was "comfortable" with

previously suspended sentence of eight months, one-third the middle term, which was run consecutively to the sentence in the instant case.

3.

making an identification, noted "possible" next to defendant's picture. In court, the employee identified defendant as the person who took the merchandise.

**Count II**

Later that same day, December 6, 2023, an employee at a different store in Turlock discovered an empty "merchandise protection" wrap taken from a missing vacuum cleaner. The vacuum cost $749.99 to purchase. A loss prevention manager of the store determined the vacuum had been taken without being purchased after reviewing the store's surveillance footage and transaction history. From the footage, the manager watched a person remove the merchandise protection and put the vacuum into a shopping cart. The manager observed this person was a "Hispanic male wearing a black jacket, khaki shorts, [and] white shoes with … a black stripe on the back." The manager further observed the person had distinct facial features including his hairline and smile. The footage showed the person leave the store through the "fire exit" and get in a red SUV.

On December 12, 2023, another vacuum went missing from the same store. This vacuum was the same model and price as the one taken on December 6, 2023. When the manager examined the surveillance footage, she watched a person remove the merchandise protection from the vacuum and walk out of the store without making any attempt to pay for the item. Although the person was wearing a mask, the manager noticed this person looked "very similar" to the person who took the same model of vacuum on December 6. Specifically, the manager observed this person's hairline, build, and shoes were the same as the person captured on December 6. She also saw similarities in how the item's merchandise protection was removed and how the person walked inside the store. The manager further noticed it was the same item as the one taken on December 6, which was "not usually common especially within the time frame."

Prior to trial, the manager identified defendant in a six-pack lineup. The manager identified defendant in court as the person who took the vacuums.

4.

**Law Enforcement Investigation**

Detective N. Urban of the Turlock Police Department investigated retail theft in the area. Urban was assigned to investigate the two vacuums taken on December 6 and December 12, 2023. Urban was provided with defendant's name. After viewing the surveillance footage from two of the stores and comparing the footage with pictures of defendant, Urban determined defendant was the person in the surveillance footage at those stores.

## DISCUSSION

### I. Closing Argument

Defendant contends the trial court abused its discretion by prohibiting defense counsel from showing his slideshow presentation of celebrities during closing argument. The People contend the trial court did not abuse its discretion by doing so, but even assuming error, the error was harmless. We conclude that any assumed error was harmless beyond a reasonable doubt.

### A. Additional Background

Before trial, defense counsel stated he intended to use a slideshow presentation in his closing argument, but noted it was not ready at the time. The court ruled that it could be used if defense counsel disclosed it.

During closing argument, defense counsel stated, in part:

> "And lastly, again, these eyewitness identifications, they are unreliable as our eyewitness identification especially when they don't know -- when a person who is making the witness identification, such as [the employee witnesses], they're not claiming that they know [defendant] well. They don't have any familiarity with him.

> "Again, they see from the same surveillance footage that you're seeing. They see a Hispanic man, average build, short hair, black hair, white shoes. All very common traits that perhaps many people in this community are probably walking around with those features right now.

"And again, you also heard that once the detectives and the loss prevention in this case decided, you know, that they already had their person, [defendant], they didn't follow up any further and they didn't ever bother thinking, maybe we have the wrong person identified. Maybe the surveillance footage isn't that great."

At another point during his closing argument, defense counsel proposed the jury to play a "game" called "the pitfalls of eyewitness identification." Defense counsel stated:

"So, you know, members of the jury, the prosecution referenced, I believe, Who Wants to Be a Millionaire earlier.… [I]f I could take just a brief moment of the jury's time, a little bit of a game that shows the problem that eyewitness identification has especially when it comes to people who look kind of similar.

"So I'm not sure how many members of this panel are familiar with the people I'm mentioning, but they're celebrities. Perhaps you'll know a few."

The prosecution objected, stating, "Not in evidence." After a sidebar, the court excused the jury before discussing the matter further. The prosecution clarified the objection, stating:

"It's mainly that there's no foundation whatsoever. These are two images that we don't know where they derive from in an era where artificial intelligence is altering images. We don't know where these images came from, whether they are authentic, whether they are the people they purport to be, and it is a prejudicial argument to just put two cherry-picked images up on the screen and say these could be misidentified.

"There's no evidence -- the point of closing is to argue the evidence. While you may use analogies and examples, the use of exhibits that are not in evidence is improper."

The court asked the prosecution if he had an opportunity to view the rest of the slideshow presentation. The prosecution stated he had not, and that he would object to the use of any images of anything not in evidence. The prosecution further stated:

"Had [defense counsel] presented these images to a witness and asked them, you know, do these people look similar? Is it possible to misidentify? Then they would have been in evidence. They would have been used. The People could have objected to any foundationary [*sic*] issue

6.

that may have existed at that point. He just put up random images from God knows where they came from, how they were derived. Whether there's been alterations, any photoshopping, any [artificial intelligence]."

Citing several authorities, defense counsel argued the slideshow pictures were not improper because the pictures of celebrities within the slides were "more akin to using diagrams and charts to illustrate from, again, history or literature and as matters of common knowledge." Although conceding that some of the celebrities within the slides were "more obscure than others," defense counsel asserted that the celebrities were public figures and therefore the slides were permissible as they were matters of common knowledge. Defense counsel added:

> "So I am not attempting to introduce these photos into evidence. I am not attempting to, you know, submit these photos to the jury so that the members of the jury can say, oh, here's how similar people can look. I am merely using this as an illustration from common knowledge and common experience and history and literature about how people can look similar."

The court sustained the prosecution's objection to the portion of the slideshow containing pictures of celebrities.[5] The court noted that the pictures were "really misleading to the jury," were not pertinent to the facts of the case, and lacked foundation. The court also noted there was "no evidence" supporting that the pictures were of common experience, history, literature, or matters of common knowledge. To conclude otherwise, according to the court, "would assume that the juror members know who these celebrities are, one, and, two, that they are accurate representations of the celebrities themselves . . . depicted on the [slideshow pictures]."

Although the court prohibited the use of the slideshow pictures of celebrities, the court ruled that defense counsel could reference the exhibits entered into evidence, including the surveillance video, or "any argument with respect to eyewitness identification."

---

[5] A copy of the entire slideshow presentation was included in the record of appeal.

When the jury returned to the courtroom, the court admonished the jury to disregard the last shown slide of the slideshow presentation and defense counsel proceeded with his closing argument. In his closing argument, defense counsel stated, in part: "So this is [defendant] and that is the surveillance quality that you have. When you go into the jury deliberation room, you will have, again, one of those screenshots, and you will see for yourself what you can or can't see. That will be what's before you." Defense counsel also stated to the jury:

> "[T]he prosecution must convince you beyond a reasonable doubt that the person on [November 19, 2023] was [defendant]; that the person on [December 6, 2023] was [defendant]; [December 12, 2023], [defendant]; and [December 6, 2023], [defendant]. [¶] … [¶] But again, what the evidence shows is that the evidence tying [defendant] in court today to any of those four is weak; that there is reasonable doubt that remains."

The jury began deliberations on October 9, 2024. The next day, on October 10, the court received a note from the jurors requesting "a readback" of the testimony from the sporting goods store's loss prevention manager. The jury reached their verdict the following day of deliberations on October 14, 2024.

## B. Applicable Law

The closing argument is a basic element of the adversary factfinding process in a criminal trial. (*Herring v. New York* (1975) 422 U.S. 853, 858; *People v. Benavides* (2005) 35 Cal.4th 69, 110 ["A criminal defendant has a well-established constitutional right to have counsel present closing argument to the trier of fact."].) Moreover, a criminal defendant also has a constitutional right to " 'a meaningful opportunity to present a complete defense.' " (*Crane v. Kentucky* (1986) 476 U.S. 683, 690.) However, the trial court is afforded "great latitude" in controlling the scope of closing argument. (*Herring v. New York*, at p. 862; see § 1044 ["It shall be the duty of the judge to control all proceedings during the trial, and to limit the … argument of counsel to relevant and material matters."].)

8.

"At closing argument a party is entitled both to discuss the evidence and to comment on reasonable inferences that may be drawn therefrom." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) "The closing statements of counsel should relate to the law and the facts of the case as each side interprets them." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 60.) Counsel "may state matters not in evidence that are common knowledge, or are illustrations drawn from common experience, history, or literature." (*People v. Love* (1961) 56 Cal.2d 720, 730, disapproved on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 637, fn. 2.) External materials such as newspaper articles have been permitted in closing argument. (See, e.g., *People v. Pangelina* (1984) 153 Cal.App.3d 1, 9.)

### C.    Analysis

Defendant argues the trial court abused its discretion by prohibiting the display of a portion of defense counsel's slideshow presentation. He further argues that the error was prejudicial under *Chapman v. California* (1967) 386 U.S. 18. We need not determine whether the trial court's ruling was erroneous because we conclude that any assumed error was harmless under any standard.

The portion of defense counsel's slideshow presentation at issue here was six slides of 12 total celebrities. Each slide contained two different pictures of two different celebrities side-by-side, and above the two pictures were the celebrities' names and the question: "WHO IS WHO?" According to defense counsel, these slides presented a "game" for the jury to identify the correct celebrity, and the point of this "game" was to show the problem with eyewitness identification "especially when it comes to people who look kind of similar." Although conceding that some of the celebrities were "perhaps more obscure than others," defense counsel maintained that the celebrities in the slides were all public figures and therefore were "matters of common knowledge."

Any assumed error in prohibiting defense counsel from showing the jury his slideshow presentation of the game was harmless under any standard. (*People v. Watson*

(1956) 46 Cal.2d 818, 836 [reversal for state law error is not warranted unless it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"]; *Chapman v. California*, *supra*, 386 U.S. at p. 24 [before a federal constitutional error can be held harmless, the reviewing court must be able to declare a belief that it was harmless beyond a reasonable doubt].)

The trial court only prohibited defense counsel from displaying his game that had side-by-side pictures of purportedly similar-looking celebrities. Defense counsel's purpose for the game was to "show[] the problem that eyewitness identification has especially when it comes to people who look kind of similar." But the court did not impair defense counsel's ability to present arguments concerning eyewitness identification. To the contrary, the court explicitly stated to defense counsel he could reference "any argument with respect to eyewitness identification." Indeed, defense counsel discussed the asserted unreliability of both the surveillance footage and the eyewitness testimony multiple times throughout his closing argument. Defense counsel also argued that some of the physical features of the person in the surveillance footage were common rather than distinct and suggested to the jury that the investigation might have resulted in the "wrong person [being] identified." We fail to see what more the game could have relayed to the jury than what had otherwise been relayed by defense counsel throughout his closing argument.

We further fail to see how preventing the jury from seeing side-by-side pictures of similar-looking celebrities could have affected the outcome on this record. Three separate witnesses identified defendant, and only defendant, as the perpetrator of the thefts. These three witnesses had also been presented with photographs of six similar-looking men through the six-pack lineups, and each witness identified defendant. No witnesses identified anyone other than defendant. The game had no bearing on the facts or circumstances of this case.

Defendant observes that the jury deliberated for over eight hours and requested the rereading of the testimony from the sporting goods store's loss prevention manager. Quoting *People v. Woodard* (1979) 23 Cal.3d 329, and *People v. Pearch* (1991) 229 Cal.App.3d 1282, he argues that these indicate both the case was far from open and shut, and that the jury deliberations were close.[6]

Those authorities do not compel us to make such inferences on this record. The *Woodard* court confronted a record with "sharply conflicting evidence" (*People v. Woodard, supra*, 23 Cal.3d at p. 341) about the identity of the perpetrator, with one witness testifying the defendant was not the perpetrator of the charged crime. (*Id*. at pp. 341–342.) Here, by contrast, there was no evidence or witness testimony in conflict; all testifying eyewitnesses identified defendant as the perpetrator of the multiple thefts. Moreover, *Woodard* does not appear to set a time threshold for close jury deliberations. (*Ibid*.; see *People v. Walker* (1995) 31 Cal.App.4th 432, 439 ["Instead, we find that the length of the deliberations could as easily be reconciled with the jury's conscientious performance of its civic duty, rather than its difficulty in reaching a decision."].) Similarly, we cannot infer that the deliberations were close because of the jury's request for the rereading of one witness's testimony, particularly considering there was no conflicting evidence in the record. (See *People v. Houston* (2005) 130 Cal.App.4th 279, 301 ["to conclude that this was a 'close case' in light of the jury's actions 'in the absence of more concrete evidence would amount to sheer speculation on our part' "].)

In sum, we conclude that any assumed error in the trial court's limited prohibition was harmless beyond a reasonable doubt.

---

[6] For the first time in his reply, defendant appears to argue that the trial court should have allowed defense counsel to display the game since the "trial court permitted the prosecution to use aggressive rhetoric …." This is forfeited. (*People v. Dunn* (2025) 18 Cal.5th 129, 183, fn. 13 [" 'We need not, and typically do not, address arguments raised for the first time in a reply brief.' "].)

**II.    Section 1385 and *Romero***

Defendant contends the trial court abused its discretion by declining to dismiss his prior strike conviction.  The People disagree.  We do not find an abuse of discretion.

**A.    Additional Background**

Defendant requested the trial court dismiss his strike prior, a 2021 felony conviction of robbery in concert with two or more people, in the furtherance of justice under *Romero*.  In doing so, defendant argued he did not fall within the spirit of the Three Strikes law because of the nature and circumstances of the instant offenses, including that the offenses were nonviolent, the nature and circumstances of his criminal history, and the existence of adequate sentencing options without the strike prior.

The trial court held a hearing on the *Romero* motion on January 17, 2025.[7]  At the hearing, defense counsel acknowledged defendant had suffered prior felony convictions, including the 2021 felony conviction found true by the jury and the court, but emphasized that his criminal record was not particularly extensive.  Defense counsel also acknowledged defendant had a then-pending proceeding in Merced County Superior Court, in which defendant was awaiting sentencing following his guilty plea to one count of grand theft (§ 487, subd. (a)).  Defense counsel stated:

> "My reading of the RAP sheet turned over by the district attorney's office only lists three convictions, one of them being a misdemeanor. Additionally, the interest of justice . . . would be served if the Court strikes the strikes because [defendant] has a hold out of Merced.  My expectation

---

[7] A probation report was submitted to the court before the hearing.  The report listed defendant's past convictions, including:  a violation of Vehicle Code section 23103.5 on March 7, 2016; a violation of section 213, subdivision (a)(1)(A) on June 8, 2021; a violation of Vehicle Code section 20002, subdivision (a) on August 22, 2022; a violation of section 487, subdivision (a) on February 6, 2023, in Stanislaus County Superior Court case No. CR-23-000657 (the 657 case); a violation of section 148.9, subdivision (a) on July 17, 2024; a violation of section 484, subdivision (a) on July 17, 2024; and a violation of section 487, subdivision (a) on July 17, 2024, in Merced County Superior Court case No. 23CR02014 (the 014 case).

12.

is given that he pled in that case and will be sentenced in Merced, he's going to be sentenced to, I believe, four years -- for four years and eight months out of Merced once he gets sentenced there.

"I think the interest of justice don't -- would be served by simply running this -- my expectation is once he gets sentenced in Merced, this case will be run consecutive. And Merced -- he would be sentenced. The Merced sentence would be the base term and this Stanislaus County case would be the subordinate term. And that given how much jail time he's likely going to -- given how much prison time he's likely going to be getting, it would be gratuitous if the Court did [not] strike the strike."

The prosecution argued defendant fell within the scheme and the sentencing of the Three Strikes law. In doing so, the prosecution noted the recency of the prior strike conviction since it was from 2021. The prosecution further noted that the prior strike conviction was for a "home invasion robbery in concert with others," for which he was sentenced to three years. The prosecution continued:

"Immediately upon his release while he was still on parole for that case, Your Honor, he commits Case CR-23-[0]00657 in which he commits a grand theft at a [clothing store]. He immediately pleas for inexplicable reasons and is given 120 days, and the strike is stricken there.

"However, since that time in 2023, the date of the instant offense, November 19th, 2023, [defendant] not only commits these three thefts, but in between what was charged as an Estes robbery [the Merced case] and ultimately pled down to a [section 487, subdivision (c)] grand theft from person, in which [defendant] stole from a loss prevention officer at [a department store] and actually made physical contact with the store clerk from [the department store]. While I do not know the particulars of why that robbery was pled to a [section 487, subdivision (c)], there is use of physical force.

"Since his conviction on the underlying strike prior, [defendant] has shown and demonstrated in this small amount of window a repetitive nature of committing theft-related offenses and has shown that he is willing to enter the home of others and/or use physical force to accomplish that."

Defense counsel replied:

"Again, I don't know the particulars of why in Merced [defendant] pleaded as he did. I didn't handle his Merced case, and I only had brief

13.

minimal contact with his Merced attorney. … [¶] Again, ultimately what he pleaded to in Merced was something separate. Again, it was only [section] 487. It wasn't a robbery. Our position is that the Court should look at the Merced case based on what he pleaded to, not on what the prosecution in Merced may or may not have been able to prove.

"Again, in regards to the spirit of the three strikes law, again, if [defendant] was only looking at this … case, if he wasn't looking at the Merced case, then perhaps he would fall closer within the spirit of the three strikes law. However, given that he is, again, very likely to start serving a somewhat lengthy prison sentence at Merced, that factor I think puts [defendant] within the spirits of the three strikes law.

"And the last thing I want to put is upon some discussion with [defendant], I think there's some dispute as to whether or not he was still on probation at the time of the [657] case. However, our position is that even if [defendant] were on probation or parole, that he still falls … outside the spirit of the three strikes law, and that the Court should grant the [*Romero* motion]."

After considering the briefing and the parties' arguments, as well as reviewing the probation reports filed in the instant proceeding and in the 657 case, the trial court denied the *Romero* motion because it found the interest of justice did not support the dismissal of the prior strike conviction. The court stated:

"In balancing what the Court has reviewed, I would agree and note that at least in the case -- not the violation of probation case, but the felony case that's being sentenced today, that [defendant] picked up these charges while awaiting sentence in the Merced case as indicated, and there was a very short window of time. These are similar offenses.

"If you look at what the criminal history is listed on probation reports, the Court does look at the felony case from 2021 for the [section] 213, but then we also look at the -- the Court is looking at the February 2023 case which is the felony [section] 487, the Merced case -- well, Merced cases, I should say. Because he had two misdemeanors for theft-related -- at least one was a theft-related charge, and then the felony which he is actually awaiting sentence [in Merced] is also a [section] 487 felony."

14.

The court further added:

> "And while the Court acknowledged that there was some efforts, at least indicated in [defense counsel]'s motion, those do not outweigh the need to oppose the sentence that reflects the seriousness of the defendant's criminal history and the patterns he has demonstrated and the potential risk to public safety."

## B. Applicable Law

Under section 1385, the trial court has authority to order an action dismissed "in furtherance of justice." (*Id*., subd. (a).) Similarly, the Three Strikes law " 'establishes a sentencing requirement to be applied in every case where the defendant has at least one qualifying strike, unless the sentencing court "conclud[es] that an exception to the scheme should be made because, for articulable reasons which can withstand scrutiny for abuse, this defendant should be treated as though he actually fell outside the Three Strikes scheme." ' " (*People v. Carmony* (2004) 33 Cal.4th 367, 377 (*Carmony*).)

"[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law, on its own motion, 'in furtherance of justice' pursuant to Penal Code section 1385[, subdivision ](a), or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

"A court's discretionary decision to dismiss or to strike a sentencing allegation under section 1385" is reviewed for abuse of discretion. (*Romero*, *supra*, 13 Cal.4th at p. 531; see *Carmony*, *supra*, 33 Cal.4th at p. 373.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, at p. 377.)

15.

### C.  Analysis

Defendant argues the relevant factors, taken together, bring him outside of the spirit of the Three Strikes law.  Specifically, defendant notes:  he was 20 years old when he committed his strike offense; the absence of violent or armed conduct in his criminal history; the absence of violent conduct in his current offenses; a dismissed strike would result in a more proportionate sentence; and he is a Hispanic man which subjects him to relatively harsher treatment.

The trial court considered the nature and circumstances of defendant's present convictions.  The court noted defendant "picked up these charges while awaiting sentence in [the 014 case] as indicated, and there was a very short window of time."  The court further noted the similarity of the present offenses when compared with those of his past.  (See *People v. Williams*, *supra*, 17 Cal.4th at p. 163 [noting repeated convictions " 'reveals that [the defendant] had been taught, through the application of formal sanction, that [such] criminal conduct was unacceptable—but had failed or refused to learn his lesson' "].)

The trial court also considered defendant's prior convictions.  As described, *ante*, the strike offense arose from a conviction for robbery (§ 213) in 2021.  (See *People v. Humphrey* (1997) 58 Cal.App.4th 809, 813 ["In determining whether a prior conviction is remote, the trial court should not simply consult the Gregorian calendar with blinders on."]; see also *People v. Solis* (2015) 232 Cal.App.4th 1108, 1124 [a prior strike conviction is not properly stricken merely because it is 30 years old].)

Defendant had not lived a " 'legally blameless life' " since his prior strike conviction.  (*People v. Humphrey*, *supra*, 58 Cal.App.4th at p. 813.)  He had been convicted of several offenses since 2021, many being for theft-related offenses.  In February 2023, defendant was convicted of one count of petty theft (§ 487, subd. (a)) in the 657 case.  Defendant was sentenced to two years of probation and violated that probation on October 16, 2023.  Defendant suffered three other convictions in 2024 in

16.

Merced County involving grand theft (§ 487, subd. (a)), petty theft (§ 484, subd. (a)), and giving false information to a police officer (§ 148.9, subd. (a)). The probation report also lists one conviction for misdemeanor hit and run resulting in property damage (Veh. Code, § 20002, subd. (a)) in August 2022.

The trial court reasonably concluded defendant's convictions demonstrated a pattern of criminal conduct since his strike conviction. (See *People v. Humphrey*, *supra*, 58 Cal.App.4th at p. 813 ["Where, as here, the defendant has led a continuous life of crime after the prior, there has been no 'washing out' and there is simply nothing mitigating about a 20-year-old prior."].)

The trial court considered defendant's background, character, and prospects in reaching its conclusion on whether to dismiss his strike. In his motion, defendant noted that he is a father to a young child and wanted to use his time in prison to improve as a person so he can be a "good father to his son" upon release. Defendant also noted he hoped to use his time in prison to get an education and learn trade skills. The court acknowledged there were "some efforts" in defendant's motion weighing in favor of dismissing the strike. The court determined these efforts did not outweigh the "need to [impose] the sentence that reflects the seriousness of the defendant's criminal history and the patterns he has demonstrated and the potential risk to public safety." To the extent defendant points to relevant factors not explicitly mentioned by the court, we presume that these factors were considered in reaching its decision. (See *People v. Myers* (1999) 69 Cal.App.4th 305, 310 ["The court is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary."].)

Defendant has not met his burden of showing that the trial court's decision was so irrational or arbitrary that no reasonable person could agree with it. The trial court explained the factors it considered in determining he was within the spirit of the Three Strikes law. We will not second-guess the reasoned and impartial decision of the court. (See *Carmony*, *supra*, 33 Cal.4th at p. 378 [" '[w]here the record demonstrates that the

trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance' "].)

We do not find that the trial court abused its discretion.

## DISPOSITION

The judgment is affirmed.

DETJEN, Acting P. J.

WE CONCUR:


PEÑA, J.


HARRELL, J.